## WAGNER ELECTRIC CORPORATION v. SNOWDEN.

### No. 8654.

Circuit Court of Appeals, Eighth Circuit.
Feb. 6, 1930.

James R. Claiborne, of St. Louis, Mo. (John W. Joynt and Bishop & Claiborne, all of St. Louis, Mo., on the brief), for appellant.

Jesse T. Friday, of St. Louis, Mo. (Harry Felberbaum, of St. Louis, Mo., on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and MILLER, District Judge.

GARDNER, Circuit Judge.

This is an action for damages on account of personal injuries by way of occupational disease claimed to have been contracted by the plaintiff, appellee here, as the result of the negligent failure of the defendant to furnish him with a reasonably safe place in which to work. Plaintiff recovered judgment in the sum of $5,000, and defendant has appealed. No issue is raised as to the pleadings, and the issues are sufficiently disclosed in the opinion.

The answer was in the nature of a general denial, with certain unimportant admissions, and contained an affirmative defense of assumption of risk on the part of the plaintiff.

On this appeal by the defendant, error is assigned in permitting counsel for plaintiff to inquire, during the voir dire examination of prospective jurors, whether any of them owned any stock or bonds of, or were connected with, or knew any of the officers or employees of the American Mutual Liability Insurance Company of Boston. Counsel for plaintiff, outside of the hearing of the prospective jurors and in the presence and hearing of the court, called upon counsel for defendant to state whether or not any insurance company was interested in the defense in this action, and, if so, the name of the company; whereupon counsel for defendant answered, "Yes, the American Mutual Liability Insurance Company of Boston is on this risk." Counsel for plaintiff then interrogated the prospective jurors generally, as follows: "Gentlemen, I will ask you whether any of you own any of the stock or bonds of the American Mutual Liability Insurance Company of Boston?" This was objected to, and the objection overruled, and an exception saved. Counsel for plaintiff asked the further question, "Are any of you gentlemen in any way connected with that company?" This question was likewise objected to, and the objection overruled, and an exception saved. Counsel for plaintiff then asked, "Do you know any officer or employee of that company?" This also was objected to, the objection overruled, and an exception saved. No juror indicated that he held any of the stock or bonds of this company, or was in any manner connected with the company, or knew any of its officers or employees.

In support of appellant's contention, the case of Stewart v. Brune (C. C. A.) 179 F. 350, is cited as controlling. In the Stewart Case, counsel for plaintiff, without laying any foundation for the questions to be asked, and without any apparently reasonable cause to believe that the insurance company mentioned was interested in the defense of the case, asked a juror whether the company by whom he was employed was insured by the Ocean Insurance Company. There was nothing before the court to show that the Ocean Insurance Company was interested, directly or indirectly, in the result of the trial. An entirely different state of affairs obtains in the instant case. Here counsel for plaintiff, outside of the hearing of the prospective jurors and in the presence and hearing of the court, called upon counsel for defendant to state whether or not any insurance company was interested in the defense of this case, and, if so, to name the company. Counsel might have declined to answer this inquiry, and, had he done so, certainly the jurors could not have been prejudiced by the inquiry. He, however, voluntarily and frankly answered that the American Mutual Liability Insurance Company of Boston was so interested. Following this, counsel for plaintiff asked only the above-noted two or three general questions of all prospective jurors.

We are of the view that the questions appear to have been asked in good faith and for the purpose of ascertaining the fitness of the prospective jurors and proper foundation was laid for such inquiry. We do not think anything said in the opinion of this court in Stewart v. Brune, supra, is controlling or applicable to the facts presented in this case. If, as appeared in this case, the insurance company was interested in the defense, it would seem to be proper, where good faith is shown, to permit inquiry as to whether or not any of the prospective jurors were interested in that company or acquainted with any of its agents or employees. New Ætna Portland Cement Co. v. Hatt (C. C. A.) 231 F. 611; Eppinger & Russell Co. v. Sheely (C. C. A.) 24 F.(2d) 153; Connors v. United States, 158 U. S. 408, 15 S. Ct. 951, 39 L. Ed. 1033. There was no abuse of discretion in permitting counsel to ask these questions.

Assignments 2, 3, 4, 5, 6, and 7 allege error in the ruling of the court in the admission of testimony. These assignments wholly fail to comply with rule 11 and rule 24 of this court, which provide that, when the error alleged is to the admission or to the rejection of evidence, the specification shall quote the full substance of the evidence admitted or

rejected. In none of these assignments is the substance of the evidence admitted or rejected set out. Neither do the assignments show what objections were interposed. It is commonplace to state that the alleged error assigned must be sufficiently specific so that the court may understand the same without being forced to search the record to determine what the issue is. Grape Creek Coal Co. v. Farmers' Loan & T. Co. (C. C. A.) 63 F. 891; Piper v. Cashell (C. C. A.) 122 F. 614; Deering Harvester Co. v. Kelly (C. C. A.) 103 F. 261; Haldane v. United States (C. C. A.) 69 F. 819; Northwestern S. B. & Mfg. Co. v. Great Lakes E. Works (C. C. A.) 181 F. 38; Bandy v. United States (C. C. A.) 245 F. 98; Federal Surety Co. v. Standard Oil Co. (C. C. A.) 32 F.(2d) 119; Lahman v. Burnes Nat. Bank (C. C. A.) 20 F.(2d) 897; Robinette v. Sidener (C. C. A.) 33 F. (2d) 37. These rules must be observed, and, as was said by this court as early as Haldane v. United States (C. C. A.) 69 F. 819, 821: "We have invariably held that we would not consider alleged errors in the admission and exclusion of evidence unless the testimony that is claimed to have been erroneously admitted or excluded is set out substantially in the assignment of errors and in the brief, as required by rules 11 and 24 of this court." We must therefore decline to pass upon these alleged errors in the admissibility of evidence.

[3-5] By assignment No. 12, defendant challenges the ruling of the court in denying its motion for a directed verdict made at the close of all the testimony. This requires a consideration of the evidence for the purpose of determining whether or not there is substantial evidence sustaining the verdict. It is challenged in two particulars: (1) That it fails to show that the vapors and gases arising from the sulphuric acid gases in the vats were poisonous; and (2) that it fails to show that the tuberculosis from which plaintiff was confessedly suffering was caused thereby. The plaintiff having alleged in his petition that the vapors and gases arising from these vats were poisonous, it is the claim of the defendant that this presented a scientific chemical question which could be answered only by those qualified as chemists to speak expertly on the subject, and that, no such testimony having been produced by the plaintiff, and the defendant having produced testimony to the contrary, there was a failure of proof. The important thing with reference to these vapors and gases was not whether or not they were considered chemically poisonous, but whether they were injurious and dangerous to health when inhaled. It is specifically alleged in the petition that plaintiff's disease was superinduced by reason of being required to inhale these vapors and gases. It is not material that they were described by the plaintiff as being poisonous, and it is apparent that the term as used was intended to charge that the gases and vapors when inhaled injuriously affected the throat and lungs of the plaintiff, and in that sense they were poisonous. It is doubtless true that only a chemist can testify as to the chemical properties of a gas arising from diluted sulphuric acid when heated by the injection of steam, but it cannot be said that one who sees, smells, and breathes such gases and fumes, and experiences burning of the eyes, nose, throat, and chest therefrom, and after a week or so of such experience still has a burning sensation in his chest when away from work, cannot testify that there is a gas which arises under such conditions and which caused these results.

It is urged that these gases were not shown to be poisonous within the meaning of section 6818, Revised Statutes of Missouri for 1919, hereinbefore referred to. The preceding section 6817 requires employers to adopt and provide approved and effective devices, means, or methods for the prevention of such industrial or occupational diseases as are incident to such work, trade, or process. The testimony in this regard amply sustains the harmful effect of this gas and brings it clearly within the meaning of these statutes.

Was there substantial evidence tending to prove that the inhalation of these gases was the proximate cause of plaintiff's tubercular condition? It is admitted that the plaintiff is tubercular, but it is contended that this disease was contracted from other sources. It is therefore necessary to consider the evidence introduced by the plaintiff on this question. Near the vats described in the petition was a suction fan installed in the wall of the building, so as to draw off the gases and fumes arising from the heating of a sulphuric acid mixture by means of the injection of steam, but in the early part of January, 1928, some of the blades of this fan were so corroded that they became loose and some of the blades, because of their rusty and corroded condition were cut out of the fan until it became ineffective, and about the first part of February it was completely shut down and not in operation. It was during the two or three weeks following, during which time the fan was not in operation, that plaintiff claims to have suffered his injuries from the gases. After the fan had ceased to operate, the

smoke, fumes, and gases arising from the heated sulphuric acid mixture would spread over the room, where they would have to be inhaled by the workmen, including the plaintiff. This gas caused a burning in the eyes and nose and in the throat, and a burning or "a stuffing up sensation" in the chest. Plaintiff describes it as "a burning sensation of the eyes; your eyes, your nose burned; your throat stuffed up, and a burning sensation on down into your chest;" that there would be "a suffocation and a burning, just a pain went right on through the chest." The gas had an unpleasant odor, and during this time it was cold weather and necessary to leave the windows closed as the workmen worked in their shirt sleeves. Because of this gas, it was necessary for the workmen to open and go to the window for fresh air. The gas affected those nearest the machine, including plaintiff, more than those who were farther away. The plaintiff found it necessary to go to the window for air about every hour, which was as often as he was permitted to do. Plaintiff also testifies:

"I did not notice it a whole lot, outside of hard to breathe, for about possibly a week, ten days or two weeks, that it began to cause me pains.

"Q. Where? A. Through the chest, cause me pains at night when I would go home.

"Q. Where? A. Through the chest.

"Q. And did you say something about your throat before, and nose? A. Well, that was—that is right while you were in there, it caused a burning in the throat and irritated it."

Plaintiff was a young man, 22 years old, 6 feet tall, and weighed 204 pounds when he entered defendant's employ in August, 1927. He had always been healthy, and played upon the basket ball team of the defendant after entering its employ. He had been well up to the time this gas began to affect him. When he went to see the company doctor, who advised him to return to work, the medical examination included a stethoscope of his chest and an examination of his throat. The examination on February 25th included an X-ray picture and a sputum test, which revealed what the examining physician thought was tuberculosis. The plaintiff then returned to his home in Cook, Neb., and remained until he returned to St. Louis, Mo., a few months before the trial, in May, 1929.

Dr. Wolfort testified as follows with reference to plaintiff's condition:

"Q. Doctor, assuming that this man, in February, 1928, say from about the first of February, 1928, to about the 24th of February, 1928, was working in a room ninety by, say one hundred nine feet, and that he worked within fifteen feet of some vats in which sulphuric acid was being heated by means of steam, the acid contained, and the acid content or contents of these vats being about, that is, assuming that the vats would hold from fifteen to twenty gallons of liquid, and assuming that they were from two-thirds to three-fourths full, and that gases and fumes arose from this sulphuric acid while it was being heated, and that this man breathed and inhaled such gases and fumes, and that as a result of that, his nostrils, there was a burning sensation in his nostrils and in his throat and bronchial tubes, and in the chest, and that continued for that period of time, that is, assuming that he noticed it about a week after the first of February, 1928, and that it continued on from that time until he left, or shortly after he left the employment, on the 24th of February, 1928, could those gases and fumes cause an irritation such as I have mentioned, that is, the burning sensation in the nose, throat, and bronchial tubes, and lungs? A. Could they?

"Q. Yes. A. Absolutely.

"Q. And what effect would that have on a man's lungs, Doctor? A. Well, I believe that the inhalation of these sulphuric acid fumes irritated and inflamed and congested his respiratory tract, starting at his nose and his throat, down into his bronchial tubes, and any irritation of this kind weakens the bronchial tube, causes it to be intensely inflamed, usually those acid inhalations.

"Q. Will such condition make a man susceptible to tuberculosis? A. Surely.

"Q. Such tuberculosis as you found to exist in Mr. Snowden, would you say? A. This irritation in these bronchial tubes, this congestion, it makes the surface as if it were raw, and if allowed—we all breathe in these tubercular germs thousands of times a day, but when we are in healthy, normal condition, we exhale them just as rapidly, but when we have any point in our bronchial tubes, in our lungs, or anywhere, that is irritated and weakened, then we give that germ a chance to lodge there. That is just what the germ wants—a fertile place where it can stop and where it can start its mischief, and that is generally what it does in all of these cases.

"Q. And Doctor, would you say that that could have occurred in this case of Mr. Snowden, that after that irritation and inflammatory condition was present in his lungs and bronchial tubes, that that caused or produced

tuberculosis? A. It gave the germ a chance to lodge, and the germ lodging starts the tuberculosis. Now, it would not have lodged if he did not have this raw spot, this irritation. If the surface had been smooth, not broken, everything in contact, there would have been no place for it—it would make its exit just as rapidly as he breathed it in, but when this surface was inflamed and broken, then the germ gets a chance to stay right at this spot.

"Q. In other words, this inflamed condition of the lungs is a fertile field for the tubercular bacilli to propagate and to—A. Spread.

"Q. And take hold? A. Surely, because it is all inflamed.

"Q. And cause the disease of tuberculosis, is that the idea? A. Sure.

"Q. And would you state, as your opinion, that Mr. Snowden's tuberculosis was caused from that, or could be caused from that? A. It could be caused from that.

"Q. Of course, you do not know just exactly what caused it? A. Outside of the fact that he gave me his history of having been in perfect health all his life, never had anything, except mumps, prior to this condition; he had always been in perfect health, working all the time."

Dr. Sante, who made an X-ray of plaintiff's chest on March 6, 1928, testified that, if the gas was strong enough for him to experience a burning sensation, then it would be hurtful, and, if he was exposed to it continuously for several weeks so that he experienced such a sensation, anything that would tend to irritate the bronchial tubes or the lungs would tend to cause a spread of any disease that was present. There was other testimony of like character.

This testimony submitted on behalf of the plaintiff was substantial and required the submission of this question to the jury, and the verdict of the jury is conclusive on the issues.

Much of the brief of appellant is devoted to the weight of the evidence or credibility of the witnesses, but these are questions with which this court is not concerned. There was therefore no error in denying defendant's motion for a directed verdict.

At the close of the instructions the court stated to counsel that they might save their exceptions to the charge, and counsel for defendant then stated, inter alia: "Save an exception to failure of the court to instruct on the question of assumption of risk as set out in the defendant's answer at the request of the defendant verbally, the defendant not having any written instruction on this subject." It is first to be observed that no written request for the giving of an instruction on this subject was presented to the lower court, nor does it appear that any oral request was made for such an instruction, except as it may have been contained in this exception, and confessedly no such request was made until after the court had finished its charge to the jury. Ordinarily requested instructions should be tendered before the general charge is given by the court. Griffin Grocery Co. v. Richardson (C. C. A.) 10 F.(2d) 467; Southern Ry. Co. v. Shaw (C. C. A.) 86 F. 865.

Inasmuch, however, as the answer contained an allegation of assumption of risk, it might properly be argued that counsel for the defendant were warranted in assuming that the court would charge on this issue, and not until the court had completed its charge would it appear that no such charge was given. Under these circumstances we are inclined to the view that, if request was actually made on the completion of the charge, it was still timely. In our view of the case, however, the question of practice is not material, because there is no evidence in the record warranting a submission of that question to the jury. The servant assumes the ordinary risks of his employment, and such extraordinary ones as he knows and appreciates. While it appears that the plaintiff knew of the prevailing conditions, there is nothing to indicate that he appreciated the danger of continuing his employment under these conditions. In fact, it appears that he consulted the defendant's physician with reference to his health and was advised that he was all right and directed to return to work. It was not until he later consulted an independent physician that he was advised as to his condition and the injurious effects resulting from inhaling the fumes and gases from the heated sulphuric acid, and, as soon as he received such advice, he quit the employ. He was, under the evidence, justified in continuing work, at least for a reasonable time, after having consulted the defendant's physician. He continued work only about a week after he was examined by the defendant's physician. It is an appreciation of the danger, and not mere knowledge of the defect by which the danger is threatened, that bars recovery.

It is further urged that the court erred in its instructions for the reason that the evi-

dence did not bring this case within sections 6817 and 6818 of the Revised Statutes of Missouri for 1919, in that the instructions were broader than the evidence. The court submitted the case on the common-law theory of failure to exercise ordinary care in furnishing the plaintiff a reasonably safe place in which to work, and also upon the above statutes. The instructions as to the statutes were substantially to the effect that, if the character of the fumes or gases were such that they were likely to cause the employees in the plant to become ill, then it was the duty of the defendant to provide effective devices for removing them from the room and preventing them from coming in contact with the employees, and that, if it failed so to do, and because of such failure the plaintiff contracted the disease from which he claims to be suffering, then a verdict in plaintiff's favor would be justified. This part of the charge was to the effect that, if the statutes were found to be violated, it constituted negligence justifying a recovery; in other words, that a violation of the statutes would constitute negligence per se. Defendant concedes that, if the case were tried in the state courts of Missouri, such a charge would be correct, but contends that the rule in federal court is different from that of the state court, and cites in support of this contention Denver & R. G. R. Co. v. Norgate (C. C. A.) 141 F. 247, 6 L. R. A. (N. S.) 981, 5 Ann. Cas. 448; C. & O. Ry. Co. v. Stapleton, 279 U. S. 587, 49 S. Ct. 442, 444, 73 L. Ed. 861. The first-noted case simply holds that the defense of assumption of risk, unless specifically denied by the statute, is not eliminated in a suit for injury resulting from violation of such statute. The second case, decided by the Supreme Court, is not in point. That case arose under a violation of the Federal Employers' Liability Act (45 USCA §§ 51-59) and the question involved was whether violation of a state statute controlling the age of employment was negligence per se "or negligence at all under the Federal Employers' Liability Act." The court held that actions under this act are not affected by any state statute because that act entirely pre-empted the field of "rights and duties as between an interstate commerce common carrier and its employees." In the course of the opinion by Chief Justice Taft, it is said: "We come then to the specific question whether the violation of a statute of a state prohibiting the employment of workmen under a certain age

and providing for punishment of such employment should be held to be negligence in a suit brought under the Federal Employers' Liability Act. That the state has power to forbid such employment and to punish the forbidden employment when occurring in intrastate commerce, and also has like power in respect to interstate commerce so long as Congress does not legislate on the subject, goes without saying. But it is a different question whether such a state act can be made to bear the construction that a violation of it constitutes negligence per se or negligence at all under the Federal Employers' Liability Act." The court concludes as follows: "We think that the statute of Kentucky, limiting the age of employees and punishing its violation, has no bearing on the civil liability of a railway to its employees injured in interstate commerce, and that application of it in this case was error."

There is nothing in this opinion to indicate that a different rule of negligence would be applicable in the state court from that applied in the federal court. In other words, if the Stapleton Case had been brought in the state court for a violation of the federal statute, the state statute limiting the age of employees could not have been pleaded as negligence per se because the subject of the litigation was governed by the Federal Employers' Liability Act which completely occupied the field of rights and duties as between an interstate commerce common carrier and its employees.

The Supreme Court of Missouri has held that a violation of the above statute is negligence per se, Boll v. Condie-Bray Glass & Paint Co. (Mo. Sup.) 11 S.W.(2d) 48; and the general rule in Missouri is that the violation of a protection statute is negligence per se, Beck v. Wurst Coal & Hauling Co. (Mo. App.) 293 S. W. 449; Propulonris v. Goebel Construction Co., 279 Mo. 358, 213 S. W. 792. This court has enforced the same principle or rule in Texarkana & Ft. Smith Ry. Co. v. Parsons (C. C. A.) 74 F. 408; Hover & Co. v. Denver & R. G. W. Ry. Co. (C. C. A.) 17 F.(2d) 881.

The court therefore correctly instructed the jury on this issue. We have carefully considered all the questions urged on this appeal, and are clearly of the view that the record presents no prejudicial error.

The decision of the lower court is therefore affirmed.