[Civ. No. 6255. Second Appellate District, Division Two.—December 10, 1929.]

EFFIE W. SMITH, Respondent, v. E. B. BROWN, Appellant.

Sarau & Thompson and B. P. Gibbs for Appellant.

Bertrand J. Wellman for Respondent.

BURNELL, J., *pro tem.*—This case arises out of the same accident as that involved in *Davis* v. *Brown,* 92 Cal. App. 20 [267 Pac. 754]. The plaintiff in that case was a passenger in the automobile driven by the defendant, while the plaintiff in the instant case was riding in her own car when it was struck by that of the defendant. The accident occurred January 19, 1925, at about 11:30 A. M., and the scene was the North Broadway tunnel which runs north and south between Temple Street and Sunset Boulevard, in the city of Los Angeles. The case was tried before a jury, which rendered a verdict of $10,250 in favor of the plaintiff. This verdict was reduced on motion for a new trial to $7,500.

Appealing from the judgment based on the verdict as thus reduced in amount, the defendant first contends that the verdict was contrary to the evidence and the law in that "the proof discloses no negligence on the part of the defendant." With this contention we cannot agree, feeling that the evidence disclosed a set of circumstances under which the question of defendant's negligence was properly submitted to the jury and determined by it on somewhat conflicting testimony. As to most of the facts there is a substantial agreement on the part of the witnesses for the respective parties. Thus all agree as to the time

and place of the collision, that the grade of the roadway in the tunnel was downhill from south to north, that the tunnel was 765 feet in length and that the width of the roadway therein, from curb to curb, was thirty feet six inches. There is no conflict as to the fact that it had been raining outside of the tunnel and that the surface of the roadway therein was wet and slippery by reason of water from the street having been "tracked in." It was not disputed that the Chevrolet car in which the plaintiff was riding was proceeding from north to south, on the west or right-hand side of the tunnel, nor that it was struck and practically demolished by the Lincoln car owned by the defendant, operated as a taxicab and driven by his employee, and which was proceeding in the opposite direction. The defendant, however, urges that the evidence shows the accident to have been unavoidable in that to avoid collision with another automobile which skidded just ahead of his car he was forced to suddenly apply his brakes, with the result that the Lincoln car itself skidded in such a manner as to strike plaintiff's car. There was testimony on behalf of the plaintiff that the defendant's car was traveling at a rate of between twenty and twenty-five miles per hour when it skidded into plaintiff's vehicle. Witness Balderston testified that he was driving an automobile through the tunnel in the same direction as that in which plaintiff's car was proceeding and about forty to fifty feet behind the latter, and that when he first observed the Lincoln taxicab it appeared to be on the west or wrong side of the tunnel, about 150 to 160 feet from the plaintiff's car; that there were other cars proceeding in the line of traffic on the east side of the tunnel in a northerly direction and "the taxicab was on my side of the street coming toward us. What I mean by that is meeting us, and he appeared to skid sideways like he was going to turn back into his line of traffic, and he skidded sideways I should judge about 100 feet, coming down against the Smith [plaintiff's] car, striking the Smith car and driving it against my car." Mrs. Curran, a passenger in the Lincoln car, said that before it started to skid it was "traveling toward the middle" of the tunnel and that prior thereto it had been traveling on the right-hand side going north. Mrs. Smith, the plaintiff, testified: "It sort of looked to me as if it started to pass the car in front of it

and came towards the center of the tunnel and at that time it seemed to me as though he turned and started to turn back into his line again, and at that time his car skidded and slid I should say about 100 feet and struck my car." Further analysis of the evidence would serve no useful purpose; suffice it to say that it did not differ in any material respect from that reviewed in *Davis* v. *Brown, supra.* The case is clearly one of conflicting evidence, with sufficient testimony before the jury to support its verdict in favor of the plaintiff; and on this phase of the case no points of law are presented which were not disposed of in the former case growing out of the same accident.

■ Appellant next contends that the trial court erred in instructing the jury upon the question of contributory negligence. There is no merit in this contention. It is true that although contributory negligence was plead as a defense, no evidence was introduced with regard thereto and it was stipulated before the close of the trial that it should be deemed not an issue in the case. The instruction complained of was, therefore, rendered unnecessary and should not have been given, but it is difficult to imagine in what manner appellant could have been prejudiced by the giving of it; it was an instruction favorable to appellant rather than to respondent. Section 4½ of article VI of the Constitution completely disposes of this point.

The further point is made that the court erred in denying defendant's motion for a new trial for the following reasons: First, misconduct on the part of members of the jury; second, "accident which ordinary prudence could not have guarded against, emanating from the fainting of a witness while on the witness-stand, and the violent remarks of the husband of said witness made in the presence of the jury, tending and calculating to bias and prejudice the jury against the defendant"; and third, various alleged acts of misconduct upon the part of counsel for the plaintiff.

Upon the first of these points appellant relies upon two affidavits, one of which was sworn to by one of his attorneys while the other was by an "adjuster and investigator" working under the direction and supervision of the attorney. The first of these affidavits recites that during the forenoon of the second day of the trial Mr. Wellman, the attorney representing the plaintiff-respondent, requested the

affiant to approach the bench with him and told the trial judge that two of the jurors ''had been conversing together and commenting upon the testimony that was being introduced'' and that affiant then advised the court ''that he had also observed the two mentioned jurors conversing but was not close enough to them to be able to tell as to what they were talking about.'' The affidavit then goes on to recite the conclusion of the affiant that Mr. Wellman ''was in a position to be able to tell whether these jurors were commenting on the testimony that was being introduced.'' The other affidavit states that the affiant was seated ''approximately ten feet from where the jury was sitting'' and that he observed the two jurors in question ''conversing during the taking of the testimony and specially observed them make unfavorable comments and suggestions to each other regarding testimony that was being offered by defendant, or comments being made by defendant's counsel, to objections being raised by them to introduction of certain testimony or certain questions that were being asked on cross-examination by plaintiff's counsel.'' After reciting that following the conference between court and counsel referred to in the first affidavit the court ''again admonished the jury that they must not talk to any person or any member of the jury or form or express any opinion concerning the case until the case had been finally submitted to them,'' the affidavit goes on to state that ''on our return to the courtroom at 2:00 p. m., I again occupied a position to the right of the jury box and approximately 10 feet from the jury; that during the afternoon session, I paid particular attention to the actions of the two jurors herein mentioned; that I did, on several occasions, observe these two jurors conversing with each other during taking of testimony and during the time that any objection was made by either counsel for the defendant or counsel for plaintiff and I could plainly see from their actions and manner of conversing that they were very unfavorable to the defense in this action; that whenever any objections was overruled by the court that had been introduced by the defense they appeared to be satisfied, smiled and said something to each other; that I could plainly tell from their manner that they were talking together about this case and that their actions indicated clearly that they were unfavorable to the defense;

that I was present in the courtroom when there was considerable argument *pro* and *con* by the counsel for defendant and counsel for the plaintiff concerning the testimony of Mrs. Curran, who was then on the witness stand; that I personally observed the actions of Mrs. Curran when she was recalled to the witness stand and in attempting to go back to the witness stand fell in a faint in front of the jury; that her husband who was present in the courtroom rushed to her assistance and I heard him make a remark in the presence of the jury and in a loud voice, as he assisted in picking up his wife and placing her on a table in front of the jury he remarked: 'I hope now you are satisfied, she was in no condition to return to the courtroom, she has never been the same since that accident. I wish they had put me on the stand, I will tell them something.' That Judge Galbreath stated from the bench, 'That will be enough from you.' That I could plainly tell by the actions of the two jurors mentioned that they appeared to be more opposed to the defense of this action, indicating to me that they had formed an opinion before the case was submitted to them.''

It is to be observed that in neither of these affidavits is there any statement of the language used by the jurors or of the nature of the actions on their part which the affiant concluded constituted the ''unfavorable comments and suggestions.'' The first affidavit may be eliminated from consideration as merely a recital of a conversation between court and counsel containing no direct statement of what any juror had either said or done; the second must also be disregarded as merely a recital of the conclusions arising in the mind of the affiant. It is significant that no improper conduct on the part of any of the jurors appears to have been noted by the judge, had it been he would undoubtedly have sternly reprimanded the offenders, and if the gravity of the offense warranted such action, would have declared a mistrial upon his own motion or that of one or both of the parties. No such motion was made by the defendant-appellant nor does the record disclose any objection on his part to the submission of the case to the jury although the incident referred to in the affidavits was known to him prior to the completion of the taking of testimony.

■■ It is of course improper for jurors to discuss a case prior to its submission to them, but, even assuming that the conclusions expressed in the affidavit of the "investigator" were warranted by the facts which it fails to disclose, "this circumstance was known to appellant at the time of its occurrence, and no objection was made; and he could not thus remain quiet and take the chance of a favorable verdict, and keep this point in reserve." (*Monaghan* v. *Pacific Rolling Mill Co.*, 81 Cal. 190 [22 Pac. 590].) A somewhat similar situation arose in the case of *People* v. *Lawler*, 79 Cal. App. 207 [249 Pac. 18], except that there the affidavits on motion for a new trial set forth the language used by the juror whose conduct was attacked. In that case a page from a hotel register and an exemplar of the defendant's handwriting, both introduced as his exhibits, was being shown to the jury when one of the jurors remarked: "That isn't the same writing, you can't make me believe these are the same signatures," and "taking a small book and pencil from his pocket, did write therein and attempt to draw (another juror) into conversation, saying 'just look at this.'" Disposing of the contention that a new trial should have been granted because of this misconduct and noting that "no objection was interposed and no application was made to the trial court asking any relief of any kind" the court used the identical language above quoted from the Monaghan case. (See, also, *Sherwin* v. *Southern Pac. Co.*, 168 Cal. 722 [145 Pac. 92], and *Lafargue* v. *United Railroads*, 183 Cal. 720 [192 Pac. 538].)

■ Appellant's contention as to "accident which ordinary prudence could not have guarded against" is based upon the incident of the fainting witness referred to in the latter portion of the affidavit of the "investigator." Here, again, the appellant remained quiet, took the chance of a favorable verdict and attempted to hold the point in reserve. A somewhat similar incident occurred during the trial in *Swendsen* v. *Pacific Electric Ry. Co.*, 175 Cal. 502 [166 Pac. 21, 22], although there the defendant acted promptly and asked that the jury be discharged and a mistrial declared and renewed his objection by way of a motion for a new trial. The court there said, as we do here, "The motion for new trial was addressed to the sound discretion of the court, and it cannot be said that there was any abuse of discretion

in refusing to disturb the verdict on the ground of this trivial occurrence.''

We are not impressed by appellant's point that a new trial should have been granted because of the misconduct of counsel. Counsel on both sides of the case indulged at one point in the trial in what the record shows to have been an unseemly wrangle over a question of evidence in which each was guilty of interrupting the other, the witness under examination and the court, but there is nothing to indicate that this ungentlemanly conduct was calculated to prejudice the jury against the appellant. In *Lafargue* v. *United Railroads, supra,* much the same sort of controversy was relied on as ground for a new trial which the court denied. Upholding this action of the trial court, the Supreme Court said: ''In doing this the court must be deemed to have concluded that no prejudice was suffered by defendant by reason of any of the matters to which we have referred. Conceding some of the statements made by counsel, whatever the provocation thought by him to exist therefor, were improper, we are satisfied that this conclusion of the trial judge should not be disturbed by an appellate court. The trial judge is in a much better position than an appellate court to determine whether the verdict in a case is probably due wholly or in part to such alleged misconduct as we have here, and his conclusion in the matter should not be disturbed unless, under all the circumstances appearing, it is plainly wrong. This, we think, may not fairly be said here. We certainly cannot say that there was any intent on the part of counsel to get before the jury matters which he *knew* were inadmissible. It seems to us from the record that he was acting in perfect good faith. . . . '' Here the controversy arose over the effort of counsel for the plaintiff to question a witness as to statements made by him at another trial in which the same accident was involved without exhibiting to the witness the transcript of his testimony at such former trial, a transcript of which plaintiff's counsel had no copy. It is unfortunate that the court did not, as it should have done, firmly and decisively call both counsel to order at the very inception of a course of conduct in which each was guilty of a breach of that decorum and courtesy to be expected and demanded of those who appear in the temple of justice

and particularly of those whose position at the bar makes them officers of the court, but we cannot say that there was any abuse of discretion on the part of the court below in determining, as it did in denying the motion for a new trial, that the conduct of counsel was not calculated to prejudice the jury against the defendant.

Finally, appellant urges that the damages awarded are so excessive as to appear to have been given under the influence of passion or prejudice.

As has been noted, the jury brought in a verdict in the sum of $10,250 which was reduced by the court on the hearing of the motion for a new trial to $7,500. The plaintiff testified that as a result of the impact her right hand was injured and "I was pretty near black and blue all over, and my ankle was cut and bruised and swollen, and the top of my foot had a hole pretty nearly through the top of my foot. My nose was all swollen and bleeding terribly. I was blood all over and the car, I expect, had a cup of blood in the bottom of the car. . . . The back of my neck hurt very badly, and such terrible pain in it, and in the middle of my back was a place that was hurt that was black and blue, too, and this one bone here (indicating the breast bone) was all black and blue." She further testified that prior to the accident she was in very good health and working as an interior decorator, an occupation which necessitated climbing around on ladders, and that ever since the accident she had been unable to do any of that sort of work and that the injury to her right hand prevented her from holding a pen or a brush in it. The accident was in January, 1925, the trial was in October, 1926, and there was testimony that during all of the intervening period the plaintiff had suffered pain as the result of her injuries. As one witness put it: "She has never been the same since the accident and she has had to be under the care of a doctor at least once or twice a week and she has been nervous and complained of her back and of her ankle hurting her and terrible headaches at night." X-ray photographs taken eleven months after the accident disclosed "a condition . . . of the lower three vertebrae of mild osteo arthritis or inflammation of the joints between the vertebrae"; also, "inflammation or osteo arthritis between the fifth, sixth and seventh cervicals (vertebraes of the neck), and a fallen

arch," a condition which might be caused either by trauma or by disease. Dr. Alden Jones was positive that plaintiff's condition was due to trauma and that her injuries were of a permanent nature and that her condition would gradually become worse. There was other testimony corroborative of the above which it would serve no useful purpose to review.

The remission under order of the court, of a portion of the sum specified in the verdict placed the case, so far as the propriety of the jury's action was concerned, in the same condition as if a verdict had been returned in the first instance for the reduced amount. (*Lynch* v. *Southern Pac. Co.,* 24 Cal. App. 108 [140 Pac. 298].) It was said in *Kelley* v. *Hodge Transp. System,* 197 Cal. 598 [242 Pac. 76, 81], "Unless we are able to say that the award of damages made by the jury and sustained by the trial court was so grossly disproportionate to any compensation reasonably warranted by the facts as presented to us on appeal as to shock the sense of justice and raise at once a presumption that it was the result of passion, prejudice or corruption, rather than an honest and sober judgment, this court may not exercise the power of revision. (8 Cal. Jur. 834; *Holmes* v. *California Crushed Fruit Co.,* 69 Cal. App. 779 [232 Pac. 178]; *Zibbell* v. *Southern Pac. Co.,* 160 Cal. 237 [116 Pac. 513].)"

Under the circumstances disclosed by the evidence in this case we are unable to say that the verdict, as reduced by the court, was unwarranted by the evidence as to the nature, extent and probable permanence of the injuries suffered by the plaintiff.

The judgment is affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.