## MARYLAND CASUALTY CO. v. ELMIRA COAL CO.*

### No. 9723.

Circuit Court of Appeals, Eighth Circuit.

March 5, 1934.

Spencer F. Harris, of Kansas City, Mo. (Paul G. Koontz, of Kansas City, Mo., on the brief), for appellant.

Paul R. Stinson, of Kansas City, Mo. (Roy B. Thomson, Alfred M. Seddon, and Ryland, Stinson, Mag & Thomson, all of Kansas City, Mo., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

GARDNER, Circuit Judge.

This is an action at law brought by appellee, as plaintiff, to recover damages for the alleged bad faith of the appellant in failing and refusing to settle certain claims for damages suffered by one of appellee's employees. The parties will be referred to as they appeared below.

Defendant issued to plaintiff an employer's liability or indemnity policy, covering, in a limited amount, damages to plaintiff's employees during a period of one year from February 25, 1925. During the year following the execution of the policy, one Joe Thompson, employed by plaintiff in its coal mines, suffered two injuries, one in September, 1925, and the other in December, 1925.

*Rehearing denied May 9, 1934.

By the terms of the policy, the defendant agreed with the plaintiff, among other things, as follows:

"I. To insure said Assured as respects bodily injuries by accident, including death resulting therefrom, in accordance with the provisions of the Specific Agreement as aforesaid applicable to such injury or death.

"II. To serve the Assured (1), by the inspection of work places set forth in the respective schedules of such Specific Agreements whenever deemed necessary by the Company and thereupon to suggest to the Assured such changes and improvements as may operate to reduce the number and severity of such injuries, (without liability however upon the Company for failure so to do); and (2) upon notice of such injuries, by investigation thereof or by such negotiation or settlement of resulting claims as may be deemed expedient by the Company.

"III. To defend in the name and on behalf of the Assured any suits or other proceedings which may at any time be instituted against the Assured on account of such injuries, including death resulting therefrom, including suits or other proceedings alleging such injuries or death and demanding damages therefor, although such suits, proceedings, allegations and demands are wholly groundless, false or fraudulent; but the Company reserves the right to settle any such suit.

"IV. To pay all costs taxed against the Assured in any legal proceedings defended by the Company, all premiums on attachments and/or appeal bonds required in any such proceedings, all interest accruing after entry of judgment up to the date of payment by the Company of its share of such judgment, and all expenses incurred by the Company for investigation, negotiations for settlements, and/or defense of claims or suits; further, to pay the cost of such immediate surgical relief as is imperative at the time of accident."

There was provision limiting the company's liability as follows: "The Company's liability for loss on account of one person so injured or killed is limited to Five Thousand and no/100 Dollars ($5,000.00), and, subject to the same limit for each person, the Company's total liability on account of any one accident so injuring or killing more than one person is limited to Ten Thousand and no/100 Dollars, ($10,000.00)."

The policy provided that, upon the occurrence of an accident, the insured should give the insurer immediate written notice, and, in the event of suit, should forward to the insurance company summons, notice, or other process served. It was also provided in the policy that: "The Company is not responsible for any settlements made, or any expenses incurred by the Assured, unless such settlements or expenditures are first specifically authorized in writing by the Company; except that the Assured may provide at the time of the accident, at the expense of the Company, such immediate surgical relief as is imperative."

By a rider attached to the policy it was provided that: "In consideration of the rate at which this Policy is written, it is hereby understood and agreed that the Company will furnish at its own cost and expense such medical, surgical, hospital and ambulance services as shall be necessary for any injury sustained by employees of the Assured and covered by the terms of the policy."

Each accident in which Thompson received injury was promptly reported to the insurance company, in accordance with the provisions of the policy. The details of the facts connected with the accidents which resulted in Thompson's injuries are not of the utmost importance, as it must be conceded under this record that they were such as gave rise to very serious claims against the assured.

At the time of receiving his first injury, Thompson was working on a conveyor in plaintiff's coal mine, cleaning off the cuttings from the previous day. The conveyor was controlled by means of a lever which, however, had been broken several days before so that it required more time to stop the conveyor than if had been in proper repair. The operator of this lever, with knowledge of Thompson's position on the conveyor, had left his post. The conveyor, in its course, traversed a section near a crossbeam or strip, which left insufficient space for the passing of a man's body. Thompson, approaching this obstruction, signaled to the operator to stop the conveyor, but, because of the operator's absence from his post and the difficulty of stopping the conveyor in its broken condition, Thompson struck the crossbeam and was injured before the operator stopped the conveyor. He was taken from the mine in an unconscious condition. The doctors reported a large bruise near the sacroiliac region, and he was later taken to Kansas City, where an examination under X-ray showed a bad strain of his sacroiliac joint on the left side, "which is going to

618

cause him quite a little disability." The doctor placed a brace upon his spine.

His second injury was caused by the falling of a large rock from the roof of the mine while he was at work under the direction of a foreman, after complaint had been made to the foreman of the dangerous condition of the roof and he had given Thompson assurance that it was safe. The falling rock struck Thompson on the back, shoulders, and neck, cutting two gashes in his head, breaking his breastbone and two ribs, and inflicting serious bruises.

It is the claim of plaintiff that defendant, in violation of its duty to it, neglected, failed, and refused to make investigation of the facts connected with these accidents, and that it had been guilty of bad faith in failing to avail itself of the opportunity it had to settle with Thompson for his injuries.

At the close of all the testimony, defendant moved for a directed verdict, which the court overruled, sending the case to the jury under instructions limiting the issues as hereinafter noted, and the jury returned a verdict in the sum of $7,029.50.

In submitting the issues to the jury, the court limited its consideration to one issue by the following instruction: "The issue of fact in this case is this: Was the casualty company guilty of bad faith, guilty of reckless disregard of the interests of the coal company in that having been given an opportunity to effect a reasonable settlement with Thompson, the injured employee, that it arbitrarily refused to make or enter into such a settlement? That is the issue of fact upon which you Gentlemen must pass upon the evidence in this case. The burden of proof, Gentlemen, is upon the plaintiff to prove that the defendant, the casualty company, did, in the respects I have indicated, act in bad faith towards the coal company in reckless disregard of its interests."

Counsel for appellant, in their brief, say: "The only question involved in this case was whether or not in view of conditions which were known to the representatives of the Maryland Casualty Company it was guilty of bad faith in not settling the case before trial and involved only the condition of the injured man, Thompson, as he was or appeared to be at the time of the alleged offered settlement."

[1, 2] This question is presented by assignments which challenge the action of the court in denying defendant's motion for a directed verdict, in the giving of certain instructions, and in denying other instructions requested by defendant. There are other assignments which challenge certain rulings of the court in admitting evidence, but all these assignments must be eliminated because they are wholly insufficient. Such assignments must state the questions, the objections made thereto, the rulings of the court thereon, and the substance of the evidence admitted, with the pages of the printed record where the rulings occur. These assignments fail to show what objections were interposed by plaintiff, and, to entitle defendant to a review of such rulings, the assignments must affirmatively show that a good objection was interposed and overruled.

Certain instructions were requested by defendant and refused by the court, and counsel for defendant took exception to certain portions of the instructions as given by the court; but we are of the view that, unless the court erred in denying defendant's motion for a directed verdict, it did not err either in denying the instructions requested by defendant, nor in giving the instructions to which defendant excepted.

█ If, under the law, there is substantial evidence to sustain the verdict of the jury, then the judgment appealed from should be affirmed; otherwise, it should be reversed.

█ By the terms of this policy, the insurance company had the exclusive right to negotiate settlements and to defend any suits that might be brought. The insured was precluded from settling or compromising any such claim. Doubtless, the insurance company had the right to exercise its own judgment upon the question of whether the claim should be settled or contested, but, having by its contract prohibited the insured from negotiating for a settlement or interfering in any manner with the negotiations, except upon specific authorization of the insurance company, it was incumbent upon the insurance company honestly, intelligently, and in good faith to exercise its judgment. If, upon a fair investigation of the facts, it in good faith decided to contest rather than settle the claims, it had a right so to do. But, in view of the relation created by its contract through which the rights to negotiate for compromise or settlement were transferred from the insured to the insurer, there arose an implied duty on the part of the insurance company to exercise these rights honestly and intelligently. To intelligently exercise them, it was necessary that it investigate the facts and the probable extent of the liability. It could not blindly and arbitrarily

refuse to make settlement. American Mutual Liability Ins. Co. v. Cooper (C. C. A. 5) 61 F.(2d) 446, 448; Attleboro Mfg. Co. v. Frankfort Ins. Co. (C. C. A. 1) 240 F. 573; Hilker v. Western Automobile Ins. Co., 204 Wis. 1, 231 N. W. 257, 235 N. W. 413; Brassil v. Maryland Casualty Co., 210 N. Y. 235, 104 N. E. 622, L. R. A. 1915A, 629; Brunswick Realty Co. v. Frankfort Ins. Co., 99 Misc. 639, 166 N. Y. S. 36; Cavanaugh Bros. v. General Accident Corp., 79 N. H. 186, 106 A. 604; Douglas v. United States Fidelity & Guaranty Co., 81 N. H. 371, 127 A. 708, 37 A. L. R. 1477; Tyger River Pine Co. v. Maryland Casualty Co., 170 S. C. 236, 170 S. E. 346; G. A. Stowers Furniture Co. v. American Indemnity Co. (Tex. Com. App.) 15 S.W.(2d) 544; Butler Bros. v. American Fidelity Co., 120 Minn. 157, 139 N. W. 355, 44 L. R. A. (N. S.) 609.

In principle, this case is very similar to that considered by the Circuit Court of Appeals of the Fifth Circuit in American Mutual Liability Ins. Co. v. Cooper, supra. In the course of the opinion in that case, it is said: "We are of opinion that this relationship imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured. It was open to the jury to find that the insurer did not perform this duty. The insurer failed to interview the witnesses, or to make any effort to determine whether there was any liability upon the claim asserted against the insured for damages. It did not attempt to acquaint itself with the extent of Mrs. Auman's injuries. It was not in position to act intelligently, or in fairness to the insured in considering the offer of settlement made before suit was brought."

With this view of the law in mind, we turn to a consideration of the facts. As has already been noted, both accidents were promptly reported to defendant. It had the report of at least two doctors, clearly indicating serious personal injuries, including an injury to the spine. On December 15, following the second accident, defendant wrote plaintiff, inclosing a form of release which it desired Thompson to sign. In consideration for the execution of the release, defendant proposed to pay doctor, hospital, and medical bills amounting to $167.50. In that letter defendant asked plaintiff to explain to Thompson that the policy covered only the negligence of plaintiff, and not any negligence of any employees, saying that: "Any lost time and expenses caused by an employee's own negligence, or lack of caution is not a proper charge against this company. As far as our investigation shows, there was no defect in machinery or any condition connected with this accident, which could have been avoided by the Elmira Coal Co. For this reason there is no possibility of Mr. Thompson's receiving more in this case from us, than his medical, hospital and surgical bills."

In compliance with this request, plaintiff communicated with Thompson, showing him the above-quoted letter, and on December 31 wrote defendant, and, in referring to the result of this interview, said:

"He (Thompson) indignantly refused to sign the releases for medical attention and insists that he is in bad shape and that he will make every effort to collect proper compensation for his injury, if same is not forthcoming soon. *He lost $366.00 in wages and wants this amount as a settlement in addition to his medical attention.* Otherwise, he says he will bring suit. * * *

"It would seem to us that a case involving a real, and, possibly, permanent injury should be settled in some way regardless of the apparent liability at the expense of minor injuries which involve short periods of disability and leave no permanent effect.

"Our feeling in this matter is no doubt influenced by an unfortunate experience with an injury of this same kind, sacroiliac, in which injured obtained a large judgment on the grounds of permanent disability." (Italics supplied.)

Under date January 22, 1926, plaintiff wrote defendant, saying:

"I have been thinking this Joe Thompson business over since I talked to you yesterday and while I do not know what you have in mind about this case, nor how easy it would be to settle with Thompson at this time, it seems to me that, if Thompson has the kind of an injury he appears to have, it would be probably easier to settle with him now than later.

"It appears to me that Thompson is in a position to make a lot of trouble and will probably be hard to handle after he once consults an attorney. He told me a few days ago that he had not talked to any one yet and would not do so only as a last resort, and I believe that this is true."

Under date February 7, 1926, plaintiff sent a doctor bill to defendant, requesting payment; and on March 17, 1926, it wrote defendant advising that its adjuster had in-

structed plaintiff to continue to pay Thompson's salary for half a month, promising to reimburse the coal company in that amount, $105. On January 11, 1927, nearly a year later, defendant's adjuster wrote plaintiff that it was considering payment of the doctor bills. It did not, however, pay Thompson's wages or hospital or doctor bills, although under its contract it was obligated to pay the hospital and doctor bills, regardless of whether the insured was liable in damages for the injuries.

Defendant took no statements of witnesses relative to either accident, but apparently contented itself with having a talk with plaintiff's superintendent; and, in fact, no written statements of witnesses were procured until a year and a half after the last accident, and these were obtained by plaintiff. Plaintiff's president testified that on several occasions after these accidents, he urged the adjuster for defendant to make settlement while settlement could be made.

With full knowledge that Thompson was seriously injured in the first accident, and with only a superficial and casual investigation as to the facts, defendant, by its letter of December 15, demanded that plaintiff procure a release from Thompson for the amount of his doctor and hospital bills. As has been observed, defendant failed to pay the doctor bill sent it, and apparently was giving consideration to these bills about a year after they had been incurred. Thompson offered to settle with the representative of the defendant for injuries received in his first accident for $366 and his medical expense, but this was declined. He offered to settle with the defendant for both injuries, before he had brought suit, for $1,000. Early in July, 1926, defendant's adjuster reported to his superior that, "I do not think that there is any doubt about the man being seriously injured."

Thompson's claim not having been adjusted, he brought suit in which he sought to recover $70,000. The defendant then wrote plaintiff, suggesting that it employ counsel to co-operate with its own counsel.

Defendant maintained its attitude in refusing to negotiate for settlement right up to the time set for the trial of Thompson's action. One of its attorneys stated that he recognized the seriousness of the case, and that he had advised the insurance company to settle. In a letter written in June, 1928, he said: "I realize that this is a dangerous case and have so expressed myself to the Casualty Company. * * * However, I have a hesitancy in taking up the matter of compromise with the Company again."

We must assume that Thompson's injuries were worth $10,000. On this record, the jury may well have believed that an adequate investigation of the facts with reference to the accident and injuries was not made by the defendant; that such an investigation would clearly have disclosed not only a probable liability, but serious injuries; that its refusal to settle was not based upon an intelligent judgment because it had never in good faith determined for itself whether plaintiff's claims should have been settled.

We conclude that the court did not err in denying defendant's motion for a directed verdict. It is said, however, that the court erred in permitting the plaintiff to recover, as part of its damages, the amount of fees paid its attorneys in the Thompson Case. It appears that the sum of $1,000 was actually paid by the plaintiff for legal services rendered in that action, and it appears that this amount was a reasonable charge for such services. It was on defendant's own suggestion or invitation that plaintiff employed counsel in the defense of the Thompson suit. In view of the verdict of the jury, we must assume that defendant could have settled the Thompson claims before suit for $1,000. We must also assume that defendant's failure to make settlement was in bad faith. These acts of omission gave rise to the necessity for the employment of counsel, and, unless plaintiff can be reimbursed for this expenditure, then the damages as assessed will not compensate it for the damages suffered on account of the acts of defendant. We are of the view that, under such circumstances, reasonable attorney fees incurred and paid by the insured may be recovered from the insurer as an element of damage suffered. Brassil v. Maryland Casualty Co., 210 N. Y. 235, 104 N. E. 622, L. R. A. 1915A, 629; Butler Bros. v. American Fidelity Co., 120 Minn. 157, 139 N. W. 355, 44 L. R. A. (N. S.) 609. The bad faith of the defendant in failing to make settlement for Thompson's injuries was the proximate cause of the Thompson suit, and the attorney fee was a proper element of damages resulting therefrom.

Other contentions of appellant have been carefully considered, but we are of the view that they present no reversible error, and the judgment appealed from is therefore affirmed.