## WINEBRENNER v. UNITED STATES.
### LOOSE v. SAME.
#### Nos. 12811, 12812.

Circuit Court of Appeals, Eighth Circuit.

Feb. 14, 1945.

Rehearing Denied March 7, 1945.

WOODROUGH, Circuit Judge, dissenting.

———◆———

John G. Madden, of Kansas City, Mo. (Ira B. Burns, R. R. Brewster, and Ben W. Swofford, all of Kansas City, Mo., Francis C. Canny, of Dayton, Ohio, and Haveth E. Mau, of Cincinnati, Ohio, on the brief), for appellants.

Sheridan Morgan, Sp. Asst. to Atty. Gen. (Tom C. Clark, Asst. Atty. Gen., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge. .

Appellants appeal from separate judgments of conviction. The indictment charged these appellants, together with Baker-Lockwood Mfg. Company, Inc., W. L. Mellor and Ben D. Christian, with divers other persons to the grand jury unknown, with having violated Section 88, U. S.C.A. Title 18, by conspiring to defraud the United States of its right to have the functions of the United States Army Air Forces at Wright Field, Dayton, Ohio, in the procurement of aircraft equipment, carried on in an efficient, fair and honest manner, and of its right to the conscientious, faithful and unbiased services of Cornelius G. Loose, free from corruption, improper influence, bias, fraud or personal pecuniary interest. The indictment charged that Cornelius G. Loose was an experienced employee of the Material Center at Wright Field, through which the Government was purchasing large amounts of equipment; that his advice and recommendations were relied upon by the military personnel in charge of the purchase of these materials; that Dahne W. Winebrenner, by various means, intentionally exercised such an influence over Loose as to have contracts awarded at unfair prices to persons who would agree to use Baker-Lockwood materials which Winebrenner sold; that Loose would use his position and influence in behalf of such persons as would and against such persons as would not use Baker-Lockwood materials, without regard to the merits of such materials. The pertinent portion of the statute under which the indictment was drawn reads as follows:

"If two or more persons conspire * * to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

Each of the appellants was sentenced on December 21, 1943, to imprisonment for a period of two years and to pay a fine of $10,000. These appeals were consolidated by order of court and are presented on a single record of more than 2000 printed pages.

In seeking reversal appellants in substance contend: (1) That the court erred in overruling their motions for directed verdicts of acquittal since (a) there was no substantial evidence of the conspiracy charged, and (b) there was no substantial evidence of venue in the Western District of Missouri; (2) that the court erred in refusing to admonish the jury that its members should not discuss the cause or the evidence among themselves until final submission and in specifically authorizing the jury to discuss such evidence and to form and express opinions bearing upon the guilt or innocence of appellants with the restriction only that no such opinion should be so positive that no evidence could change it; (3) that the court erred in receiving the opinions of Friesner and documentary evidence upon his alleged identification thereof, and in refusing to strike such opinions and such evidence, and in improperly restricting the right to cross-examine the witness; (4) that the court erred in admitting in evidence the Morrissey letter, Government Exhibit 295; (5) that the court erred in receiving purported evidence that in 1942 Loose was allegedly in possession of unexplained funds when there was no substantial evidence of any connection between the conspiracy charged and the reception or possession of such funds; (6) that the court erred in restricting the

cross-examination of the witness Travis; (7) that the court erred in receiving evidence as to contract entered into subsequent to the time appellants were barred from Wright Field and after the conclusion of the conspiracy alleged; (8) that the court erred in admitting evidence of derogatory hearsay opinions reflecting upon the character of Winebrenner; (9) that the court erred in permitting prejudicial misconduct on the part of the Government, both in cross-examination and in final argument; (10) that the court erred in charging the jury that if the conspiracy charged was shown any act pursuant thereto justified conviction, and in failing to require the jury to find that an overt act charged in the indictment was committed; (11) that the court erred in charging the jury that if the jury determined that a conspiracy had been established, all of the acts or admissions of a party thereto should be considered in determining guilt or innocence; (12) that the court erred in failing properly to define the burden of proof, the presumption of innocence and reasonable doubt, and in refusing proper requests so to do; (13) that the court erred in refusing to advise the jury that the suspension of Loose and the barring of Winebrenner from Wright Field were not to be considered as proving the propriety thereof; (14) that the court erred in severing the cause into two separate charges, the one relating to Loose and Winebrenner and the other relating to the co-defendants.

█ Appellants' brief contains no assignment of errors but in lieu of such assignment they have adopted by reference thereto the assignments which appear in the record. This was done pursuant to order of this court. The assignments are therefore those appearing in the printed record and reference is made in the brief to these assignments. The sufficiency of the assignments, or some of them, is challenged by the Government, particularly those going to the question of the admission or rejection of evidence. We have examined the assignments adopted in the brief by reference, relative to the rulings of the court on the admission or rejection of evidence. None of these assignments complies with the rules of this court providing that the brief shall contain "A separate and particular statement of each assignment of error * * * intended to be urged, with the record page thereof," and also providing that "If an error assigned * * *' relates to the admission or exclusion of evidence, the statement shall quote the evidence referred to and the pertinent objections or exceptions taken, together with the rulings of the court thereon, giving the page of the printed record on which the quotation appears." The assignments referred to are wholly insufficient and we do not examine the record in search for error not properly designated or pointed out. Maryland Casualty Co. v. Elmira Coal Co., 8 Cir., 69 F.2d 616; Karlson v. United States, 8 Cir., 82 F.2d 330; Wagner Electric Corporation, v. Snowden, 8 Cir., 38 F.2d 599; Washburn v. Douthit, 8 Cir., 73 F.2d 23; Lahman v. Burnes Nat. Bank, 8 Cir., 20 F.2d 897. We shall therefore pretermit any consideration of the questions discussed involving the ruling of the court on the admissibility of evidence, except as the question may be pertinent to a consideration of the contention that the court erred in denying appellants' motions for directed verdicts of not guilty.

█ In support of their contention that the court erred in denying their motions for directed verdicts, appellants urge that there was no substantial evidence (1) of the conspiracy charged and (2) of venue. Conspiracy is an offense which must ordinarily be established, if at all, by circumstantial evidence, and the jury having found the defendants guilty we must take that view of the evidence most favorable to the Government. United States v. Manton, 2 Cir., 107 F.2d 834; Feigenbutz v. United States, 8 Cir., 65 F.2d 122; Galatas v. United States, 8 Cir., 80 F.2d 15; Ryan v. United States, 8 Cir., 99 F.2d 864; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

█ At the times pertinent under the indictment in this case, defendant Loose was an administrative officer in the employ of the Army Air Forces at Wright Field. He was an expert on purchase and as such advised various purchasing agents and contracting officers. Baker-Lockwood was a corporation engaged in fabricating canvas items at Kansas City, Missouri. It did a large annual business, its first war contract being received in July, 1940. 50 per cent of its war business was on contracts involved in the indictment in this case, and in 1942 over 80 per cent of its business was with the Government. Winebrenner was employed by Baker-Lockwood as its general sales manager and went to Wright Field

in the fall of 1940 to solicit contracts. He was also employed during 1941 and 1942 by various other concerns. He and Loose became very close friends and the jury might reasonably have found from the evidence that by agreement between Loose and Winebrenner any award on which Baker-Lockwood was to receive the canvas work would be approved through Loose' influence, and any award on which Baker-Lockwood was not to receive the canvas work would be disapproved and obstructed by Loose; that Loose, pursuant to this agreement, never questioned the propriety of bids in which Baker-Lockwood was to receive the canvas work, while on the other hand invariably where Baker-Lockwood was not to receive the canvas work Loose did question the propriety of the bid. In 1941 and 1942, Loose, because of his experience, was able to exert a controlling influence upon the letting of contracts within his jurisdiction. In the fall of 1941, he began to associate with Winebrenner, resulting in an understanding under which the rights of the War Department were subordinated to the interests of Winebrenner and the companies represented by him so as to enable Winebrenner's principals to secure contracts at exorbitant prices. Prospective bidders were given to understand both by Loose and Winebrenner that they must deal through Winebrenner. Loose actively recommended Winebrenner as a man with an entre through him to Wright Field, and he openly asserted that he would act in the awarding of contracts in accordance with Winebrenner's directions. The jury could from the evidence have found that Loose received through Winebrenner large profits for favors given Winebrenner's companies. The details of the evidence would unduly lengthen this opinion and serve no useful purpose. We are satisfied that there was abundant evidence upon which the jury might properly have found that appellants entered into the conspiracy as charged in the indictment.

It is further urged in support of appellants' motions for directed verdicts that there was no substantial evidence of venue in the Western District of Missouri. We think it clear that the evidence was insufficient to show that the conspiracy had been formed in the Western District of Missouri, but it is claimed that overt acts in furtherance of the conspiracy were committed by Winebrenner in the Western District of Missouri. W. L. Mellor, who was indicted with the appellants, interrogated with reference to one of the contracts covered by the indictment, testified as follows:

"I believe the next I knew (about the contract) was in Mr. Burns' office (in Kansas City, Mo.) on other matters and I received a long-distance call from Wright Field from Mr. Winebrenner.

"Q. What did he say? A. He said we were going to have to prime the contract and I objected to it very seriously."

Mr. Winebrenner in his testimony, interrogated with reference to Government Exhibit 146, a copy of a bid on which apparently there had been some change in date, testified as follows:

"Q. How do you account for that having been changed? A. Well, I was in Kansas City around the date that was typed in there, and we had more or less a standard form that we had used with Travis on previous orders for shelters and I had one of the girls in the office copy it and leave these blank spaces so that all I would have to do was fill in the quantities and the price for this shelter and it would have the agreement in the quotation and she, through error, put a date on it, the date she had written in.

"Q. And you changed that? A. I did.

"Q. And these pencil or pen fill-ins you made when? A. Everything was written in Kansas City prior to that except those figures in pen.

"Q. Now, the one you gave to Tyson was a similar letter to that but the date of the 13th of March was not changed. Now, taking Exhibit 174 which is directed to Ohio Tubular and is dated March 13th, was that letter likewise written in Kansas City? A. Yes, sir."

Winebrenner also testified relative to meeting defendant Christian, as follows:

"I telephoned Kansas City and told Mr. Sommerville to meet me in Chicago the next morning and we would go to Milwaukee."

Mr. Mellor, testifying with reference to a trip he made to Dayton early in November, 1941, was interrogated and answered as follows:

"Q. Well, how did you happen to go back to Dayton? A. I was called back to Dayton.

"Q. By whom? A. Mr. Winebrenner phoned me.

"Q. And you went there? A. Yes, I did.

"Q. Did you have any conference there at Dayton? A. Yes, I did.

"Q. With whom? A. With then Lieutenant Cunningham, Mr. Travis, Ed Riley, Mr. Winebrenner and part of the time Mr. Loose and myself."

■■ There was other testimony with reference to the acts done in the Western District in furtherance of the scheme which were, we think, sufficient to establish venue. Galatas v. United States, supra; Hartzell v. United States, 8 Cir., 72 F.2d 369; United States v. Downing, 2 Cir., 51 F.2d 1030; Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793. Venue, under the conspiracy statute, may be laid at any place where any act has been done by any one of the conspirators in furtherance of the conspiracy. In United States v. Downing, supra, it was urged that there was no proof of any conspiracy within the United States, or of any act done by either of the conspirators within the district where the venue is laid. In the course of the opinion it is said [51 F.2d 1031]:

"But all this is quite beside the point, since it was not necessary that Downing should have come to the United States at all. Conspirators are considered by a fiction as repeating their agreement wherever any part of it is executed. Thus, when Cullen brought the laden barge to Buffalo, and Devine and Downey discharged her, under an arrangement with Downing to that effect, all the parties to the original agreement could be treated as conspiring afresh. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas. 1914A, 614. It is true that that case and its companion, Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136, both involved the defendant's removal for trial from one part of the United States to another, and conceivably a distinction might be drawn, though not a good one; but Ford v. United States, 273 U.S. 593, 47 S. Ct. 531, 71 L.Ed. 793, is precisely on all fours with the case at bar and lays all doubts, if any could arise.

"* * * Since jurisdiction depends upon where the crime is committed, and it is committed wherever any part of the agreement is performed, the act of performance relied upon need not be an overt act laid in the indictment. We can see nothing in Downing's appeal to warrant a reversal."

■ Manifestly, the conspiracy took effect in the Western District of Missouri. If, as we may assume in view of the verdict of the jury, Mellor was induced by Winebrenner to make a fraudulent bid on work for the Government, even though Mellor was innocent, the conspiracy was brought within the jurisdiction of the court in the Western District of Missouri, where the contracts were carried out. We think there was substantial proof of the acts performed in the Western District of Missouri in furtherance of the conspiracy, and hence the court had jurisdiction.

On the first day of the term, the court in allowing the jury to separate admonished them that while they should not discuss the case with others, they might discuss it among themselves. Counsel for appellants excepted and requested the court to admonish the jury that they should not only not discuss the case with others, but should not discuss it among themselves, nor form nor express an opinion as to the guilt or innocence of the defendants until the case should be finally submitted to them. This the court at the time declined to do. On the following morning, on the convening of court, counsel for appellants renewed their request and asked the court to change the admonition theretofore given. This request of appellants was resisted by the Government. In urging the court to change the admonition, counsel for appellants among other things said to the court:

"We regard it as of vital importance in this case that the jury should be instructed that they should not discuss this case among themselves or discuss it at any time or under any circumstances except after its conclusion and submission and then in the jury room. The reason that we feel this is of vital importance and not merely technical importance is that here is a case in which the Government proof will run over a long period of time, including week-ends. If there is one juror who takes a decided view from a one-sided presentation of the evidence—and, of course, the evidence for days will be only that of the Government— and he is permitted to discuss his views and discuss evidence with other jurors, he could poison the entire jury panel.

\* \* \* \* \* \*

"It is not a question of the Court's failure to admonish the jury we are meeting here. It is the fact, in our opinion, there

has been an erroneous admonition given which we want corrected and, of course, by the way I assume under the rule we had an automatic exception to that as to any other ruling in the case.

"The Court: Yes * * *."

When the court next recessed and permitted the jury to separate, the following proceedings were had:

"The Court: Gentlemen, before you leave, my attention has been called to the fact that some courts have stated that it is desirable that a judge instruct the jury not to discuss the case among themselves during the progress of the trial until its completion, which raises the question as to whether you should not be so instructed in this case. You recall that when I admonished you heretofore as to your conduct during the trial that I said in effect that if you discuss the case among yourselves be careful not to make up your mind finally and definitely about it, some such language as that. I hesitate about saying to you flatly that you mustn't talk about the case among yourselves for practical reasons, because I know it is so natural for one to discuss with those with whom he is working on a particular undertaking that undertaking and I certainly do not want to make you inanimate beings so far as your relation with each other, but there is a reason for that rule of law that some courts have announced which is very desirable that we accomplish, whether it is necessary to go to the extent that those courts have gone in order to accomplish the result may be debatable. *The result that is sought to be accomplished is that you not discuss the case before you to such an extent that you form definite, fixed ideas that would prevent you from changing after you had heard all of the evidence in the case.* Now that is the purpose. Now, insofar as it may be necessary for you to avoid a discussion among yourselves in order to accomplish that purpose I say to you avoid discussing the case among yourselves. A casual reference to the case, reminding one of the evidence in this case, what has gone before, not in an argumentative attitude or manner, not getting one's self worked up about the case to the extent that you may be committed to a position which you would hesitate about retracting from later, if evidence coming in later might tend to change that idea, doing those things should not be done. Do you understand what I have in mind? I

go back to this not because it is of any more importance than anything else I said to you, but because my attention has been called to the fact that there are authorities which hold that in order to accomplish the result noted it is desirable that you be instructed to not discuss the case at all; because my attention has been called to those authorities I think it is desirable that I give you this explanation and this further admonition which I have just given you. You may be excused until 1:30.

"Mr. Madden: At this time we renew our objections and exceptions to the original admonition of the Court at the beginning of the trial to which reference has heretofore been made. It was my understanding, although I am not certain that it went into the record, that your Honor said that that exception at that time would be reserved to us.

"The Court: Yes, and the exceptions at this time so if the Court fails to adequately modify the form of the charge."

■ Whether guilty or innocent, appellants were entitled under the Fifth and Sixth Amendments to the Constitution to a fair trial to an impartial jury. Here the court not only declined to admonish the jury that they should not discuss the case among themselves, nor form nor express an opinion as to the guilt or innocence of the defendant until the case had finally been submitted to them, but the jury was in effect advised that the jurors might discuss the case among themselves if careful not to make up their minds finally and definitely about it. Again the court said:

"The result that is sought to be accomplished is that you not discuss the case before you to such an extent that you form definite fixed ideas *that would prevent you from changing after you had heard all of the evidence in the case.*"

■ Jurors are chosen from every conceivable walk in life. The butcher, the baker, the merchant, the taxi driver, the day laborer, the farmer, the mechanic, the accountant, the barber, the hotel clerk, the cobbler, and the gas station attendant may make up the jury in a criminal case, but however it may be composed it must be borne in mind that the jurors are unschooled and inexperienced as to their duties in a criminal case, and they are not instructed as to those duties until all the evidence has been received, except as the court may in his admonition give them

advice on their functions and how they are to be performed, and particularly as to how they should demean themselves; hence, the importance of this admonition. Without admonition their course is uncharted. Thus, it is not until the final submission of the case that the jurors are told that a defendant is under the law presumed to be innocent and not guilty and that that presumption attends him throughout the trial, so that it is incumbent upon the Government to prove the guilt of the defendant beyond a reasonable doubt. These instructions are deemed of vital importance as fixing the standards to be followed by the jury in determining the guilt or innocence of a defendant. If, however, the jurors may discuss the case among themselves, either in groups of less than the entire jury, or with the entire jury, they are giving premature consideration to the evidence. By due process of law is meant "a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." The jury should not discuss the case among themselves because, first, they have not heard all of the evidence; second, they have not heard the instructions of the court as to how this evidence is to be considered by them, and neither have they heard the arguments of counsel. The crime here charged was not a common one with which the layman is more or less familiar, such as larceny or other well known common law crime, but it was a statutory crime more or less technical and intricate in its nature, with which the ordinary layman was wholly unfamiliar. For this additional reason the jury could not give intelligent consideration to the evidence without the assistance of the court's instructions. This is demonstrated or verified by reference to the instructions given by the court on submitting the case to the jury which comprise eighteen pages of the record.

Under the court's admonition the jurors were warranted as a result of discussion among themselves, either in small groups or large ones, to form opinions so long as such opinions were not so absolutely fixed that they would "prevent you from changing after you had heard all of the evidence in the case." Such an opinion of necessity could result from a discussion of only a part of the evidence, the evidence not having all been submitted. Such an opinion once formed could only be re-

moved, if at all, by evidence. This in effect shifted the burden of proof and placed upon the defendants the burden of changing by evidence the opinion thus formed. A juror having in discussion not only formed but expressed his view as to the guilt or innocence of the defendant, his inclination thereafter would be to give special attention to such testimony as to his mind strengthened, confirmed or vindicated the views which he had already expressed to his fellow jurors, whereas, had there been no discussion and no expression of tentative opinion, he would not be confronted with embarrassment before his fellow jurors should he change the tentative opinion which he might entertain from hearing evidence. Chief Justice Marshall in the notable trial of United States v. Aaron Burr, C.C.Va., Fed.Cas. No. 14,692g, speaking on the qualifications of a juror who may have heard the testimony at a former trial, said:

"Such a person may believe that he will be regulated by testimony, but the law suspects him, and certainly not without reason. He will listen with more favor to that testimony which confirms, than to that which would change his opinion; it is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in the case."

In the instant case, under the court's admonition, the juror may well have formed and expressed to his fellow jurors an opinion. The same thought is expressed by Circuit Judge Love in Pool v. Chicago B. & Q. R. Co., C.C. Iowa, 6 F. 844, 850, where it is said:

"There is no right more sacred than the right to a fair trial. There is no wrong more grievous than the negation of that right. An unfair trial adds a deadly pang to the bitterness of defeat.

"Now, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence. This pride of opinion and of consistency belongs to human nature."

In Patton v. United States, 281 U.S. 276, 50 S.Ct. 253, 263, 74 L.Ed. 854, 70 A.

L.R. 263; speaking of the obligation of the trial court to preserve the right of the accused to trial by jury, the Supreme Court, speaking through Mr. Justice Sutherland, said that such duty "is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity."

The solicitude of courts that jurors remain open minded to a consideration of the entire case, rather than opinionated and impervious to fair debate and decision, is demonstrated by instructions to them after prolonged deadlock, which urge each juror "to get into his mind what his colleagues have to say before arriving at his final decision and then be guided by his own judgment." United States v. McGuire, 2 Cir., 64 F.2d 485; Boehm v. United States, 8 Cir., 123 F.2d 791.

 This admonition is subject to the further criticism that it permitted groups or coteries within the jury, including the alternate juror, to discuss the case during the many weeks the Government was introducing evidence * and to form opinions which it was incumbent upon the defendants to overcome by evidence, whereas defendants were entitled to have the case considered not by divisions or coteries of jurors, which might include the alternate juror, but by the entire jury. Courts have generally held that after the case has finally been submitted and the jury placed in custody of an officer to be kept together, that it is error to permit them to separate. Defendants were entitled to have their case considered by all the jurors as a jury. Here, without instructions as to the law, without hearing all the testimony, and without hearing argument of counsel, they were authorized to divide themselves into separate groups and distinct deliberative bodies. So general is the rule that jurors should not discuss a case prior to its submission to them, that it has been enacted into statute in practically all the states of the Union. Of course, the local state statute can have no bearing on the question of procedure in a criminal case tried in Federal court, but the fact that such statutes have so generally been adopted is significant as indicating the generally accepted principle that it is improper for jurors to discuss a case prior to its submission to them. The state statutes are but codification of the common law practice that has prevailed as a part of our jurisprudence for more than a century and a half. Thus, in Shippy v. Peninsula Rapid Transit Co., 197 Cal. 290, 240 P. 785, 787, that court said:

"It is the long-established right of both of the parties thereto to have an opportunity to argue the cause and to have the jury after such argument instructed by the judge of the court as to the law of the case; and it was equally the duty of the jury under the admonition of the court not to form or express an opinion with respect to the merits of either the facts or the law of the case until the case should be finally submitted to them."

And the District Court of Appeal of California in Smith v. Brown, 102 Cal. App. 477, 283 P. 132, 134, said:

"It is of course improper for jurors to discuss a case prior to its submission to them * * *."

Diligent counsel for the Government have not been able to call to our attention any precedent which in principle sustains the admonition as given in this case, and our research has discovered none. The effect of the admonition given in this case is, of course, impossible of ascertainment, but as it violates the principle that an accused is entitled to be heard before he is condemned, and the essentials to a fair trial, the judgments appealed from must be reversed.

In view of our decision on this question, it is deemed unnecessary to consider other contentions of appellants based upon proper assignments of error as the alleged errors complained of are not likely to occur on a retrial of the cases. The judgments appealed from are therefore reversed and the cause remanded to the lower court with directions to grant appellants a new trial.

WOODROUGH, Circuit Judge (dissenting).

I do not concur in the reversal of the conviction of the defendants in this case. I do agree with the majority that the trial court's rulings on evidence and the instructions given the jury at the close of the evidence were not erroneous. I also agree

---

* The trial lasted for seven weeks.

that the defendants were proven guilty beyond reasonable doubt and I am satisfied they were rightly sentenced. The reasons advanced for reversal do not appeal to me. They are not directed to the merits of the case but are related solely to the form in which the court in the early stages of the trial undertook to warn the jury against the kind of misconduct on their part which occurs when jurors make up their minds before the evidence is all in. The argument is that such misconduct could occur if members of the jury should form groups and argue themselves into opinions before they have a right to do so. There is no hint or suggestion that any of the jurors in this case did anything of the kind, or that any one of them spoke an improper word throughout the trial, but the reversal is rested on the theory that the court did not sufficiently instruct the jury against that sort of misconduct. The trial court's warning against that particular misconduct being deemed insufficient, it is reasoned that jurors may have thought themselves free to indulge in it. And as I follow the reasoning, the conviction has been reversed without finding that the defendants actually suffered any prejudice, solely on that possibility.

My guess has always been that when people bribe a juror they admonish him to keep his mouth shut in the trial, and that is what he does. The substance of the demand of the defendants in this case was that the court give all the jurors that same admonition (though they did not specify the language they wanted it to be couched in), and the court declined. It noted for one thing that it was not practical. No normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters. The unnatural conduct of the single juror who never said a word except "That's the way I'm votin,'" drew natural suspicion. The jurors here were properly admonished by the court against the misconduct of venting expressions about the case that might commit them before the evidence was all in, and the court having indicated the purpose of the law and its own purpose to forbid such misconduct, summed up the whole matter by giving the jury the positive, traditional and proper command—"I say to you, avoid discussing the case among yourselves."[1] Every juror obeyed that command and did avoid (i. e., "keep away from, shun, eschew, abstain from") discussing the case, so far as the record shows. We have no right to assume the contrary.

Of course there is some discretion in the trial court as to how far he shall go in telling a jury, "Don't do this," and "Don't do that," and in this case the refusal of the court to say to the jury that he would rate any casual interrogation, or idle, inconsequential, inadvertent or facetious remark a contempt, affords no ground for the speculations on the imaginary jury misconduct that have been elaborated. The defendants had no right to, and I assume they had no interest to have the jurors subjected to extraordinary, suspicious and unnatural silence among themselves. As I see it, if the jurors here obeyed the court and did not commit their minds till the evidence was all in, then the right of the defendants to open minded deliberation was preserved to them. They were not prejudiced and we are forbidden to reverse.

I do not find in any case that has been cited any instance in which a just verdict has ever before been vacated because of such remote possibility of misconduct of the jury as is suggested by the record here. There has been no instance of reversal of a conviction because of some remark of a juror not deemed to reflect a fixed opinion before the evidence was in. I am satisfied that there is no precedent for reversing this case upon the mere theoretical possibility of jury misconduct that has been propounded, and I would not create one. I would affirm.

---

[1] The record does not include any different admonition at any other time.