# United States Court of Appeals
## For the First Circuit

No. 08-2449

UNITED STATES OF AMERICA,

Appellee,

v.

MARC JADLOWE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lipez, Circuit Judge,
Souter, Associate Justice,*
and Howard, Circuit Judge.

James L. Sultan, with whom Jonathan Harwell and Rankin & Sultan were on brief, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Michael K. Loucks, Acting United States Attorney, was on brief, for appellee.

December 3, 2010

*The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  Appellant Marc Jadlowe raises multiple issues of substance in challenging his conviction on drug conspiracy charges.  Most significantly, he argues that the district court committed structural error by instructing the jurors that they could discuss the case among themselves during the trial, before formal deliberations commenced.  We agree that the instruction was erroneous.  We conclude, however, that a showing of prejudice is necessary to justify a new trial based on premature jury discussions.  As the record here shows beyond a reasonable doubt that the flawed instruction did not compromise the jury's deliberative process, Jadlowe is not entitled to a new trial on that basis.  We also find no reversible error in the suppression and evidentiary rulings that Jadlowe disputes.  We therefore affirm the judgment of conviction.

## I.

In November 2005, a federal grand jury charged Jadlowe and fourteen other individuals in an eleven-count indictment alleging various drug-related crimes.[1]  Jadlowe was named in two counts, one alleging conspiracy to possess and distribute cocaine, in violation of 21 U.S.C. § 846, and the other alleging possession and distribution of cocaine on November 4, 2005, in violation of 21 U.S.C. § 841(a)(1).  We set forth here the background of the

---

[1] All of Jadlowe's co-defendants pled guilty.

conspiracy, as depicted by the government at a suppression hearing and at trial.[2]

In late September 2005, the Drug Enforcement Administration ("DEA") initiated a wiretap on the phone of Brandin Gonsalves, one of Jadlowe's co-defendants, as part of an investigation into drug trafficking activities in and around New Bedford, Massachusetts. Within the first week of the wiretap, the DEA intercepted a call between Gonsalves and another defendant, John Ferreira, Jr., in which the men discussed using "Uncle Mar[c]'s" garage to store a suspected shipment of cocaine.[3] Law enforcement agents concluded that "Uncle Marc" was Jadlowe based on, inter alia, pen register data obtained from Gonsalves's phone showing that Gonsalves frequently exchanged calls with a phone number the agents linked to Jadlowe.[4]

---

[2] Jadlowe does not dispute the sequence of events described by the government, but he claims that the government did not prove his knowing involvement in a cocaine conspiracy. He argues in particular that the admissible evidence failed to show that he was one of the participants in a series of wiretapped phone conversations in which the government identified him as a speaker or that he was the individual seen on a videotape made by officers doing surveillance at his home.

[3] On October 21, 2005, the government obtained court approval for a second wiretap of Gonsalves's phone and an initial wiretap of Ferreira's phone.

[4] A "pen register" is a device used, inter alia, to record the dialing and other information transmitted by a targeted phone. 18 U.S.C. § 3127(3); see also United States v. Santana, 175 F.3d 57, 61 n.2 (1st Cir. 1999). DEA Task Force Agent Andrew Simmons testified that a "pen order" authorized law enforcement officers "to track who was calling the phone number, what numbers were being

-3-

On October 5, 2005, DEA agents intercepted a call between Gonsalves and Ferreira at 10:24 p.m., and another call from Gonsalves to Jadlowe a minute later, in which the men discussed how much Jadlowe would be paid for the use of his garage to temporarily store ten to twenty kilograms of cocaine. On October 8, Gonsalves and Jadlowe discussed putting a generator in Jadlowe's house and running an extension cord, apparently to provide light for the unloading of the cocaine in the garage.[5] Although Gonsalves told Jadlowe the drugs were expected to arrive "in a couple of days," a call between Gonsalves and Ferreira on October 21 indicated that the delivery had been delayed because the supplier had run into problems with law enforcement authorities.[6]

On November 3, the DEA intercepted a call between Ferreira and an unidentified male who reported that "[m]y plane got delayed but, yeah my girl be here early in the morning," prompting agents to set up surveillance for the next day at Jadlowe's home at

---

called, the duration of the call, the time of day of the call, and we would get that real time."

[5] Agent Simmons testified that the gas and electricity were shut off at Jadlowe's home address during that time period.

[6] In the call, Ferreira told Gonsalves that he had spoken with "Fofado" and that "Rudolfo got bagged up by the feds . . . [c]rossin' you know." Agent Simmons testified that the government was unable to identify Rudolfo or to connect this conversation with a specific drug seizure.

30 Arch Street in Dartmouth, Massachusetts.[7] Early on November 4, DEA Special Agent Michael Barbuti and other law enforcement officers began physical surveillance near Arch Street while Agent Simmons and his team monitored the Gonsalves and Ferriera wiretaps from another location. At about 11 a.m., DEA Special Agent Jennifer Fallon began surveillance of 30 Arch Street from an unmarked police truck that was parked on a street parallel to Arch Street, monitoring the scene through a video camera.[8]

Shortly before 2 p.m., the multi-faceted surveillance bore fruit. Fallon saw someone enter the garage at 30 Arch Street, at which point she turned on the camera and began videotaping. She then saw the man move items from the garage to the yard. Meanwhile, the wiretap was capturing calls between Gonsalves and Jadlowe revealing that Jadlowe was clearing out his garage to make

---

[7] The buildings at 30 Arch Street, which were owned by Jadlowe's family, consisted at that time of an unoccupied house, still under construction, that was attached to the garage at the front of the property and a separate residence behind that structure (identified as 30R Arch Street). Jadlowe's driver's license and vehicle registration both listed 30 Arch Street as his address.

[8] Fallon was the only agent with a direct view of 30 Arch Street, but she testified that she "was just looking at a screen inside the truck," not out any windows. Other officers would occasionally drive by the house, but Barbuti explained at the suppression hearing that they could not park within sight of the house because "[i]t's a very residential area with no sidewalks, and vehicles that would be parked there would be easily recognized."

room for a truck.[9]  About an hour later, Jadlowe called Ferreira and told him the garage was "all set" – the doors were unlocked, and the back window was open to let in light.  As agents watched, Jadlowe then left the garage and drove away.

At about 3:45 p.m., agents saw a white truck enter Jadlowe's garage.  At 3:53 p.m., Ferriera called Jadlowe and said that "they" were over at his house, in the garage, "right now" and had been there for ten minutes, but that there were "no lights over there."  Jadlowe instructed Ferreira to tell them to remove paper that was covering the door as a way to allow in more light.  At approximately 4:16 p.m., Ferreira reported to Jadlowe that "them cats are putting the truck back together.  They're out of there."  At about 4:30 p.m., agents saw the truck leave the garage and drive away and, a minute later, Jadlowe called Ferreira to report that he had seen the truck leaving his street.  The two men agreed to meet at 30 Arch Street.  Jadlowe was seen on the video arriving at his residence a few minutes later, and in a series of three recorded conversations at about 4:40 p.m., Ferreira asked Jadlowe if he could "see them things there . . . [r]ight above the window behind the insulation."[10]  The men were still on the phone as Ferreira

_____

[9] In the first call, at 1:56 p.m., Jadlowe reported that he was "[t]aking care of the garage."  At 2:40 p.m., he told Gonsalves: "You should be able to fit the truck in here no problems."

[10] Simmons testified that much of the communication between the conspirators in this case was conducted by using phones as "Direct

arrived at 30 Arch Street, at which point he told Jadlowe that he did not want "them things just bring the phone." Ferreira and Jadlowe were seen driving off together at about 4:50 p.m.

Meanwhile, after being alerted by phone, Massachusetts State Trooper Stephen Fortin had stopped the white truck for a license plate violation a short distance from 30 Arch Street. Officers observed Ferreira drive past the truck and patrol car, and Simmons testified that contemporaneous phone calls Ferreira made to Gonsalves and a man named "Snack" revealed that the men were "in somewhat of a panic" about the truck's detention and the "need[] to move the stuff" from Jadlowe's garage.

At approximately 5:30 p.m., Agent Fallon saw a car pull into the driveway of 30 Arch Street and, with the car's headlights shining into the garage, an individual entered the building. Agent Barbuti and his team arrived soon thereafter, and he and another officer encountered Jadlowe coming out a door from the garage. Jadlowe was arrested, pat-frisked and handcuffed, and a cell phone was taken from him.[11] Agents then entered the garage, where they saw in plain view ten brick-shaped packages that turned out to be kilogram amounts of cocaine stacked atop a pile of drywall toward

---

Connect" devices, a mode in which they functioned like walkie-talkies. When the phones were used that way, a new "session" was recorded each time a change in speaker occurred.

[11] There is a disagreement between the parties about whether the record shows that the phone was seized in the frisk. See infra Section IIB.

the rear of the garage. Several agents remained in the garage overnight while Agent Simmons obtained a search warrant for the property. At about 11 a.m. the next day, November 5, 2005, agents executed a warrant for Jadlowe's garage and the two houses at 30 and 30R Arch Street. They seized the ten packages of cocaine from the garage and other items, including phone records, from the houses.

Following his indictment on the two drug trafficking charges, Jadlowe filed a motion to suppress the evidence seized on November 4 and 5. After an evidentiary hearing, the district court denied suppression of the cocaine and the cell phone,[12] but granted his motion to suppress the evidence seized from the two houses.[13] A five-day jury trial concluded on July 7, 2008, with findings of guilt on both counts. Jadlowe was sentenced to 120-month terms of imprisonment on each count, to run concurrently, followed by five years of supervised release.

On appeal, Jadlowe renews his argument that the cocaine and cell phone should have been suppressed because they were products of the officers' unlawful entry and overnight stay in his garage, and he argues that the court also should have suppressed

---

[12] The court found that the phone was seized from Jadlowe's person at the time of his arrest.

[13] The government had in fact conceded that the items found in the houses must be suppressed because the affidavit filed in support of the search warrant application established probable cause to search only the garage.

phone records that he claims were linked to documents found during the unlawful search of his home. He also raises a host of evidentiary arguments: (1) the court should have excluded an exhibit containing a list of incoming and outgoing wiretapped calls because that list consisted of inadmissible hearsay; (2) the court erred in allowing Agent Fallon to give lay opinion testimony identifying Jadlowe in the November 4 videotape; (3) the court erred in allowing Agent Simmons to identify Jadlowe's voice in wiretapped phone conversations; and (4) the court erred in allowing the jury to view transcripts of wiretapped phone conversations that identified Jadlowe as one of the speakers. Finally, Jadlowe asserts that a new trial is required because the district court virtually invited the jury to engage in premature deliberations when it instructed the jurors that, as the trial progressed, they could talk about "interesting things that happened during the course of the trial, . . . interesting things witnesses say, significant pieces of evidence."

We begin our discussion with the court's suppression rulings.

## II.

Jadlowe challenges the district court's denial of his pretrial motion to suppress the cocaine and cell phone found at 30 Arch Street, as well as the court's ruling at trial allowing the government to introduce records that he claims were the tainted

"fruit" of the illegal search of his houses.  In evaluating the denial of a suppression motion, we review the district court's findings of fact for clear error and its legal conclusions de novo. United States v. Larios, 593 F.3d 82, 92 (1st Cir. 2010).  As the issues differ with respect to each of the three challenged items of evidence, we address them separately.

## A.  The Cocaine

The government concedes on appeal that the law enforcement officers initially saw the ten bricks of cocaine during an unlawful entry into Jadlowe's garage.  The officers did not have a search warrant, and the government accepts the district court's implicit finding that the entry was not justified by exigent circumstances.  Noting the distinction "between the securing of a premises from its perimeter, which does not require exigent circumstances, and the impounding of a premises by occupying it from the inside, which does," see United States v. Dessesaure, 429 F.3d 359, 370 (1st Cir. 2005),[14] the court pointed out that 30 Arch Street was under "close physical surveillance" on November 4 and that the only realistic risk that the cocaine would be moved or

---

[14] We noted in Dessesaure that some police officers "may have mistakenly believed that they were free, absent a search warrant or exigent circumstances, to enter a dwelling in order to 'freeze' the scene."  429 F.3d at 370.

that any other evidence would be destroyed was eliminated by Jadlowe's arrest.[15]

The court went on to conclude, however, that the cocaine was nonetheless admissible at trial under the principles set out in Segura v. United States, 468 U.S. 796 (1984), and its progeny. In Segura, the Court held that an illegal entry to secure a premises did not preclude admission of evidence found during a later search of the same location pursuant to a warrant drawn from sources "wholly unconnected with the [illegal] entry." Id. at 814. Although the evidence at issue in Segura had been discovered for the first time during the second, untainted search, the Court in Murray v. United States, 487 U.S. 533 (1988), extended the "independent source" doctrine to "evidence that had been observed in plain view at the time of a prior illegal entry," id. at 535. The Court stated that the question in such circumstances is "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." Id. at 542. That would not be so, the Court explained, "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained

---

[15] In light of those circumstances, the court also rejected applicability of the "'protective sweep' rule" of Maryland v. Buie, 494 U.S. 325 (1990), which allows officers to conduct a warrantless "sweep" of a premises following an arrest based on a reasonable belief "that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337.

during that entry was presented to the Magistrate and affected his decision to issue the warrant."  Id.

In Dessesaure, 429 F.3d at 367-69, we adopted a two-part inquiry to implement Murray's holding.  In determining whether evidence discovered in a lawful search pursuant to a warrant may be admissible in the aftermath of an unlawful entry, we consider: (1) whether the search warrant affidavit contained sufficient information to support probable cause without any information gleaned from the unlawful search; and (2) whether the decision to seek the warrant was in fact "'independent of the illegal entry,'" i.e., "'whether it would have been sought even if what actually happened had not occurred.'"  Id. (quoting Murray, 487 U.S. at 542 n.3); see also United States v. Siciliano, 578 F.3d 61, 68 (1st Cir. 2009) (noting that, "under the independent source doctrine, 'evidence acquired by an untainted search which is identical to . . . evidence unlawfully acquired' is admissible" (quoting Murray, 487 U.S. at 538)).

Jadlowe concedes that the officers had probable cause to search the garage even before they saw the cocaine, and he therefore contests only prong two, i.e., the district court's conclusion that the agents' decision to seek a warrant was independent of the illegal entry.  The police officers' subjective intent to seek a warrant is a factual determination subject to clear error review.  Siciliano, 578 F.3d at 69.

-12-

The district court explained its ruling on that issue as follows:

> Here, there can be no doubt but that a warrant would have been sought even had the agents not observed the packages of cocaine in the garage. Too much evidence had been gathered and too much corroborating conduct on the part of the defendants had been observed for agents to simply take the chance that what was delivered . . . to the garage at 30 Arch Street was some innocent commodity.

Jadlowe argues that the record does not support the court's finding. He acknowledges that Agent Simmons, the lead law enforcement officer in the investigation, testified that he would have sought a warrant even had the officers not seen the bricks of cocaine in the garage. Jadlowe claims, however, that Simmons' assertion is belied by the officer's earlier testimony that the operational plan called for seizing the cocaine in a motor vehicle stop after Gonsalves or Ferreira retrieved the drugs from the garage.[16] He emphasizes the absence of direct evidence that, at the time they entered the garage, the agents intended to obtain a warrant and cites cases in which such contemporaneous evidence was

---

[16] At the suppression hearing in September 2007, Simmons testified as follows:

> The plan at that time was, if the cocaine was unloaded at that address, it was anticipated that either Mr. Gonsalves or Mr. Ferreira would go to that address to retrieve the cocaine. At that point, once they retrieved the cocaine to move it to another location, we were going to do a motor vehicle stop of their vehicle in order to obtain the cocaine.

present.  See, e.g., United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995) (noting that agents had been preparing the search warrant affidavit for several days before an unlawful garage entry); United States v. Ford, 22 F.3d 374, 378 (1st Cir. 1994) (noting that, prior to unlawful entry, police had told defendant of intent to obtain a warrant).

As an initial matter, we agree that Simmons's statement of his subjective intent is not necessarily dispositive.  See Murray, 487 U.S. at 540 n.2; Dessesaure, 429 F.3d at 369.  We can also accept Jadlowe's assertion that the officers had neither begun the process of securing a warrant nor even formed the intent to obtain one before the quickly developing events of November 4 unfolded contrary to their plans.[17]  Our cases, however, reject as "too rigid" the requirement that the officers be actively pursuing a warrant at the time of the unlawful entry, United States v. Silvestri, 787 F.2d 736, 746 (1st Cir. 1986), and favor instead a "flexible standard" based on "[t]he specific facts of each case," Ford, 22 F.3d at 377.[18]  "[T]here is no necessary requirement that

_____

[17] At trial, in July 2008, Simmons testified that the plan conceived the night of November 3 was to "allow the delivery to take place, secure the address into which it was brought to, and then apply for a warrant that day."  We assume, in Jadlowe's favor, that the intent to secure a warrant did not develop until the next day.

[18] Silvestri and Ford both involved the "inevitable discovery" doctrine rather than the "independent source" doctrine, but we have recognized that the two doctrines are "close relative[s]," Siciliano, 578 F.3d at 68 n.4.  The inevitable discovery doctrine

-14-

the warrant application process have already been initiated at the time the illegal search took place." Silvestri, 787 F.2d at 746.

Here, we discern no clear error in the district court's finding that the circumstances as a whole left "no doubt" that the officers would have sought a warrant – as they eventually did – once they realized that they needed to enter the garage to gain possession of the drugs. The record permitted the district court to find that the officers had not applied for a warrant earlier because they expected to arrest one or more of the conspirators and seize the drugs in a vehicle stop. Although the officers' strategy changed as the events of November 4 unfolded, their testimony reflects an assumption that cocaine would be – and then was – delivered to Jadlowe's garage. Simmons testified that when the wiretaps revealed the conspirators' intent to move the cocaine from the garage to a different, less accessible location, the officers determined that they might need to take action at 30 Arch Street. Barbuti's testimony similarly reflects a belief that there was

---

applies when the evidence at issue was not later obtained independently, but it "'inevitably would have been discovered by lawful means.'" Id. (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). The Supreme Court similarly has observed that "[t]he inevitable discovery doctrine . . . is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Murray, 487 U.S. at 539. The flexibility we apply in the inevitable discovery context is at least as appropriate where the evidence was subsequently obtained by lawful, independent means.

cocaine in the garage: "We formulated a plan that we did not want to allow the kilograms to leave that area for fear of losing them or having them be moved to a location where we weren't able to surveil." The district court thus reasonably found that, well before the officers saw the cocaine, they resolved not to "take the chance that what was delivered . . . to the garage at 30 Arch Street was some innocent commodity."

Jadlowe suggests that excusing the agents' unlawful entry here would seriously undermine the Fourth Amendment's warrant requirement, allowing officers to "always choose first to illegally search the premises" and to forego seeking a warrant when no evidence is found. The Supreme Court in <u>Murray</u> explicitly rejected such an argument:

> As petitioners see the incentives, law enforcement officers will routinely enter without a warrant to make sure that what they expect to be on the premises is in fact there. If it is not, they will have spared themselves the time and trouble of getting a warrant; if it is, they can get the warrant and use the evidence despite the unlawful entry. We see the incentives differently. An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it. Nor would the officer <u>without</u>

-16-

suffient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.

487 U.S. at 539-40.

Nor are we persuaded by Jadlowe's attempt to depict this as the egregious case where suppression is necessary to vindicate the principles underlying the exclusionary rule. In United States v. Madrid, 152 F.3d 1034 (8th Cir. 1998), the case on which he primarily relies, the evidence indicated that, while awaiting a warrant, "officers went upstairs and downstairs [in a residence] on two or three occasions, detained and searched the occupants, seized wallets and placed them in envelopes marked 'evidence,' and leafed through personal mail and a notebook." Id. at 1040. Here, by contrast, the district court found that the officers left undisturbed the targeted, plain-view evidence, and "[t]he most that agents did that might be said to have compromised the crime scene was to rearrange some furniture to make themselves more comfortable."[19]

In sum, while the district court correctly noted that "the more appropriate course would have been to secure the garage from the perimeter," it properly applied the independent source

---

[19] Jadlowe's counsel elicited testimony from Agent Barbuti acknowledging that the officers were responsible for placing a white plastic chair, a radio, and a bottle of Coca-Cola near the cocaine so that they would be "more comfortable while hanging out in the garage."

-17-

doctrine in refusing to suppress the cocaine seized from Jadlowe's garage.

**B. The Cell Phone**

A cell phone linked with phone number (508) 536-1022 ("the 1022 phone") was seized by the agents sometime during the events surrounding Jadlowe's arrest at 30 Arch Street on November 4. Relying on the testimony of Agent Barbuti, the district court found that the phone was "seized from [Jadlowe's] person" in a lawful search incident to his arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973) (holding that a search incident to "[a] custodial arrest of a suspect based on probable cause" is reasonable under the Fourth Amendment); United States v. Nascimento, 491 F.3d 25, 49 (1st Cir. 2007) ("Officers effecting an arrest are entitled to make a search incident to that arrest."). In its written ruling on the suppression motion, the court stated that Barbuti had testified that Lieutenant Robert Andrade, the arresting officer, "took the phone from Jadlowe during the search and handed it to him [Barbuti] for safekeeping."

Jadlowe points out that the testimony presented by Barbuti and Andrade differed from the court's description and argues that, given the actual record, the court clearly erred in finding that the seizure of the phone was lawful. Barbuti in fact testified that he was uncertain about who had given him the phone

or when he had received it,[20] and Andrade testified that he had no memory of taking the phone from Jadlowe.[21]   In light of this testimony, Jadlowe argues, the government failed to meet its burden of proving that the phone was seized legally.  See, e.g., United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) (noting the government's burden to prove the lawfulness of a search).

Although the officers' testimony leaves some ambiguity as to exactly when and how Barbuti acquired the phone, we are comfortable that the district court's finding that it was seized from Jadlowe's person at the time of his arrest was not clearly erroneous.  See United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004) (describing the relevant inquiry as "whether the evidence presented at the suppression hearing fairly supports the court's finding").   As the government points out, Barbuti testified unequivocally that he had been told the phone had been taken from Jadlowe's person, and Andrade testified that he knew "there was a cell phone at the location."  Jadlowe himself represented that the

---

[20] Barbuti stated: "At some point, I don't know if it was [right after the pat-frisk] or immediately after doing a protective sweep of the residence, I was handed the cell phone from Mr. Jadlowe's person."  He said he did not remember who handed it to him, but confirmed that it was "represented to [him] that it had come from Mr. Jadlowe's person."

[21] When asked if a cell phone was "found on Mr. Jadlowe subsequent to your arrest of him," Andrade responded: "I know there was a cell phone at the location.  I don't recall it being on Mr. Jadlowe."  He reiterated that reply in response to a follow-up question: "I don't recall a cell phone being found on his person."

-19-

phone had been on "his person" in his motion to suppress (a point noted by the district court).[22] Moreover, the scope of a permissible search incident to an arrest is not limited to the arrestee's person, but includes "'the area from within which he might gain possession of a weapon or destructible evidence.'" Nascimento, 491 F.3d at 49 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). There is no evidence that the officers entered either of the Jadlowe houses before obtaining the warrant, and the record therefore supports the view that the phone was found near Jadlowe, even if not on his person.

To succeed in challenging the denial of a suppression motion, a defendant "must show that no reasonable view of the evidence supports the district court's decision." United States v. Dunbar, 553 F.3d 48, 55 (1st Cir. 2009) (quotation marks and citation omitted); United States v. Larios, 593 F.3d 82, 92 (1st Cir. 2010). Jadlowe has not made that showing here.

## C. The Phone Records

At trial, the government introduced, as Exhibit 12, Sprint Nextel phone records that Jadlowe claims should have been suppressed because they were the fruit of the government's illegal

---

[22] In his motion to suppress, Jadlowe stated: "The defendant also moves to suppress any evidence seized from his person on November 4th, 2005, including a cell phone." His affidavit in support of the motion states that, "[o]n information and belief, the government intends to use evidence seized from the property and from my person against me at trial."

search of his homes on November 5. Exhibit 12 included information about the 1022 phone, which was the one seized incident to Jadlowe's arrest, and referred to a second phone with the number (508) 982-1964 ("the 1964 phone"). Phone records related to the 1964 phone had been seized from Jadlowe's residence, but the court suppressed them in ruling that the search of the homes was not supported by probable cause. Simmons testified, however, that the government had relied on those improperly seized records concerning the 1964 phone when it issued a single subpoena to Sprint for information about the two phone numbers.

It appears undisputed that the government's only information about the 1964 phone derived from the illegal search and, hence, no evidence about that phone number should have been admitted at trial. The information in Exhibit 12 about the 1022 phone, however, derived from a court-authorized pen register of Gonsalves's cell phone in August 2005 and, as such, was not a fruit of the illegal search of Jadlowe's home.[23]

Technically, therefore, Exhibit 12 contained both admissible and inadmissible evidence, and Jadlowe may be correct that the court erred in allowing it into evidence. But any such error was certainly harmless. With respect to the 1964 phone,

_____

[23] The pen register identified a phone with an IMSI number – which is like a serial number – of 316010102274660. The Sprint records connected that IMSI number to the 1022 phone and to the phone's use as a Direct Connect device with the number 183*913*2639.

-21-

Exhibit 12 says only that "[n]o records were found . . . during the requested time period." The bulk of the information on the exhibit relates to the 1022 phone. The document identifies the 1022 account holder as Marc Souza, whose listed date of birth is the same as Jadlowe's. That section of the document also links the IMSE number from the pen register with the 1022 phone seized from Jadlowe, thereby linking him with intercepted calls to and from Gonsalves and Ferreira.[24] Hence, the damaging information in the exhibit was all lawfully derived.

Jadlowe attempts to sidestep this critical dichotomy between the admissible and inadmissible information in Exhibit 12 by arguing that the document implicitly suggests that the two phone numbers are linked. Even if that were true, it would not matter. The exhibit in effect said nothing about the 1964 number, there was no substantive testimony about it, and the government did not rely on it. We agree with the government that, even if admission of Exhibit 12 were error, it did not influence the verdict and was

---

[24] Each of the two sections of the document, which are separated by a line of asterisks, begins with a listing of "Request Type," followed by the explanation "Subscription Info (Basic)." Each lists a "Date Range" and "Subject Number." The top section identifies the number as "5089821964" and the bottom section lists "316010102274660" as the number. The top section then has a listing for "Comments," which is followed by the "[n]o records were found" entry. The bottom section lists an account number, subscriber name, address, comments (the "comment" is that the account was established in June 2005), and a variety of other information, including the full 1022 phone number and the Direct Connect number.

therefore harmless.  See, e.g., United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009).

### III.

Jadlowe argues that the district court committed reversible error by telling the jurors that they could discuss the evidence as the trial progressed, before they commenced formal deliberations, so long as they did not express an ultimate opinion about the outcome of the case.  Preserved claims of instructional error are reviewed under a two-tiered standard: we consider de novo whether "an instruction embodied an error of law," but "we review for abuse of discretion 'whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'" United States v. Silva, 554 F.3d 13, 21 (1st Cir. 2009) (quoting United States v. Ranney, 298 F.3d 74, 79 (1st Cir. 2002)).

Ordinarily, even if we find instructional error, a defendant is entitled to a new trial "only if it had a prejudicial effect." Bastien v. Goddard, 279 F.3d 10, 16 (1st Cir. 2002); see also Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").  An exception exists for errors that are "so intrinsically harmful as to require automatic reversal . . . without regard to their effect on the outcome." Neder v. United

-23-

States, 527 U.S. 1, 7 (1999); see also United States v. Brandao, 539 F.3d 44, 58 (1st Cir. 2008).

## A. Did Instructional Error Occur?

The challenged instruction was delivered before the opening statements as part of the court's explanation of how the case would proceed:

> I just have a few special instructions about your conduct as jurors. The first one is the hardest. You are not to discuss the case with each other or anyone else until you retire to the jury room at the end of the case to deliberate on your verdict.
>
> This rule is not as strict as it sounds. When I say you are not to discuss the case, I mean it in this sense. You are not to express an ultimate opinion about the outcome of the case.
>
> Personally, even this rule, the way I state it, I don't think is a terribly good rule. I understand the reason for it. The thought is that because some of us tend to be more opinionated and assertive than others, jurors who are more assertive will tend to influence the opinions of fellow jurors if jurors are talking about the case before they hear all of the evidence. I think this, in fact, underestimates the intelligence of almost all the jurors that I have worked with over the years, but, nonetheless, this is the federal rule. It's been abolished in a number of states, but it is the federal rule. So we have to respect it. Like I say, whether we agree with the wisdom of a rule or not, it is the rule, the rule we follow.
>
> But, again, don't over-interpret what I said. Of course you'll talk about interesting things that happened during the course of the trial, idiosyncracies of the judge and the lawyers, interesting things witnesses say, significant pieces of evidence. Just do not express an opinion about the case, again,

until you begin deliberations and each have an opportunity to make your opinions known.

Jadlowe's counsel properly objected to the instruction, arguing that "it's inappropriate for the jurors to discuss the case in any way, shape, or form until all of the evidence is in, they've heard closing argument, and they'[v]e heard your Honor's charge." The court disagreed:

> No. Human nature, if you tell them not to discuss the case, defies anything we know about human beings. What's important is that they not form any ultimate opinions about the case until they've heard all of the evidence and that they not express opinions about the resolution of the case to one another. And that's – if you want me to repeat the thrust of that instruction again, I will, but that's what I meant.

Defense counsel then elaborated on his concern:

> Your honor, my objection is I don't think they should be talking about "interesting things that the witnesses said." I just think that that's not what the jury should be doing. They should be simply – they can talk about the weather or the Red Sox. They should not be talking about the case.

The court concluded the colloquy as follows:

> I disagree, and I think that's the reason states, at least those who have a progressive view of jury service, have abolished that rule now. In fact, even as to ultimate opinions as to the case, which I restrict them from talking about. I think you will find that the modern trend is against the old-fashion rule.

The court's instruction was unmistakably erroneous, including the assumption that the "modern trend" in criminal cases

is to allow juror discussion.  For more than a century, it has been a common-law principle that "it is improper for jurors to discuss a case prior to its submission to them," a practice that safeguards a defendant's "entitle[ment] under the Fifth and Sixth Amendments to the Constitution to a fair trial to an impartial jury." Winebrenner v. United States, 147 F.2d 322, 329, 327 (8th Cir. 1945); id. at 329 ("So general is the rule that jurors should not discuss a case prior to its submission to them, that it has been enacted into statute in practically all the states of the Union."). While jury innovations in some jurisdictions now include allowing jurors to discuss evidence among themselves throughout the trial, see, e.g., Ariz. R. Civ. P. 39(f),[25] such developments have arisen

---

[25] Rule 39(f) states:

> If the jurors are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or permit themselves to be addressed by any person on any subject connected with the trial; except that the jurors shall be instructed that they will be permitted to discuss the evidence among themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence.  Notwithstanding the foregoing, the jurors' discussion of the evidence among themselves during recesses may be limited or prohibited by the court for good cause.

See also, e.g., Colo. Jury Instr., Civil 1:4 (4th ed.) (allowing discussion of evidence "only among yourselves and only in the jury room when all of you are present"); N.D.R.Ct. 6.11 (permitting court, without objection, to allow predeliberation discussion in civil cases).

primarily in the context of civil cases,[26] and even in that setting such discussions have "remain[ed] controversial." <u>Kelly</u> v. <u>Foxboro Realty Assocs., LLC</u>, 909 N.E.2d 523, 528 & 529 n.17 (Mass. 2009) ("While the parties in a civil case may consent to juror discussions during the trial, we would not approve of that practice in a criminal case.");[27] <u>see</u> <u>also</u>, <u>e.g.</u>, Valerie P. Hans & Neil Vidmar, <u>The Verdict on Juries</u>, 91 Judicature 226, 229 (2008) (noting that allowing jury discussions during trial remains one of the "more controversial" jury reforms); <u>Juror Discussions During</u>

---

[26] The Arizona Supreme Court Committee on the More Effective Use of Juries recommended that discussion be permitted in both civil and criminal trials, but the court accepted the proposal only for civil trials. Shari Seidman Diamond et al., <u>Juror Discussions During Civil Trials: Studying an Arizona Innovation</u>, 45 Ariz. L. Rev. 1, 6 (2003) ("<u>Juror Discussions During Civil Trials</u>"). The American Bar Association also has endorsed discussion of the evidence during recesses in civil, but not in criminal cases. <u>See</u> American Bar Association, Principles for Juries and Jury Trials, Principle 13(F) (2005) (stating that jurors in civil cases may be instructed that they are permitted to discuss the evidence among themselves in the jury room with the same limitations as the Arizona rule).

[27] Indeed, the results of a national survey of jury operations and practices (the "State-of-the-States Survey") conducted by the National Center for State Courts Center for Jury Studies, published in 2007, indicate that the practice is still rarely used. The relevant report data was generated from 11,752 surveys completed by judges and lawyers involved in state and federal trials that took place primarily between 2002 and 2006. Gregory E. Mize et al., <u>The State of the States Survey of Jury Improvement Efforts: A Compendium Report</u> 4 (April 2007), <u>available at</u> www.ncsconline.org/d_research/cjs/pdf/SOSCompendiumFinal.pdf. According to the report, jurors were allowed to discuss evidence before formal deliberations in 2.2 % of the civil trials and 0.7% of the criminal trials in state court, and in 1.3% of the civil trials and 0.3% of the criminal trials in federal court. <u>Id.</u> at 32.

Civil Trials, 45 Ariz. L. Rev. at 77 ("Ultimately, like many other proposals for change, the innovation permitting jurors to discuss the case during trial has both desirable and undesirable features.").[28]

At least for now, the prevailing view in the federal courts remains that it is improper for jurors to discuss the case other than during their formal deliberations. In December 2009, the Judicial Conference Committee on Court Administration and Case Management reaffirmed the general no-discussion rule in its proposed model jury instruction on the use of electronic technology. See Judicial Conference of the United States, Comm. on Court Admin. & Case Mgmt., Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case (Dec. 2009), available at www.uscourts.gov/News/Viewer.aspx?doc=/uscourts/News/2010/docs/DI

---

[28] The Massachusetts Supreme Judicial Court observed that the studies on innovative jury practices "have not established decisively that these jury techniques are beneficial or detrimental to the outcomes." Foxboro Realty Assocs., 909 N.E.2d at 528 n.13. Specifically with respect to the bar on juror discussions about the case while the trial is ongoing, it has been observed that the prohibition is "based upon historical assumption rather than any real understanding as to how task-oriented groups actually render decisions or how discussions prior to the jury instructions would actually be likely to impact that process." Ted A. Donner & Richard K. Gabriel, Jury Selection Strategy and Science § 39:3 (3d ed. & Supp. 2010) ("Jury Selection Strategy"); see also, e.g., N.D. Sup. Ct. Joint Proc. Comm. Minutes, May 6-7, 1999, at 11-12 (discussing advantages and disadvantages of predeliberation discussion), available at http://www.ndcourts.com/court/jp/minutes/may1999.htm.

R10-018.pdf (proposing that courts tell jurors in pre-trial instructions that, "[u]ntil you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors"). Our circuit's pattern instruction is to the same effect: "<u>First</u>, do not talk among yourselves about this case, or about anyone involved with it, until the end of the case when you go to the jury room to decide on your verdict." Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 1.07 (1997), available at www.med.uscourts.gov/practices/crpji.97nov.pdf.[29] Case law from other circuits, including recent decisions, reveals similar disapproval of discussions by jurors about the case before formal deliberations begin. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Carey</u>, 337 F. App'x 256, 260 (3d Cir. 2009) (noting that "[t]he evidence of premature jury deliberation revealed a departure from the preferred process," where some jurors reported hearing other jurors discussing the case); <u>United States</u> v. <u>Cox</u>, 324 F.3d 77, 86 (2d Cir. 2003) ("'It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body.'" (quoting <u>United States</u> v. <u>Resko</u>, 3 F.3d 684, 688 (3d Cir.

---

[29] We note that, although pattern instructions are "often helpful," <u>United States</u> v. <u>Urciuoli</u>, 513 F.3d 290, 299 n.7 (1st Cir. 2008), their use is "precatory, not mandatory," <u>United States</u> v. <u>Tse</u>, 375 F.3d 148, 157 (1st Cir. 2004) (quotation marks and citations omitted).

1993)); <u>United States</u> v. <u>Dominquez</u>, 226 F.3d 1235, 1248 n.13 (11th Cir. 2000) (describing predeliberation jury discussions as a "violation of the proper process for jury decision-making"); <u>Winebrenner</u>, 147 F.2d at 328-29; <u>see</u> <u>also</u> <u>Jury Selection Strategy</u> § 39:3 ("The rule as enunciated in <u>Winebrenner</u> has remained the standard in most courts in the United States . . . .").

The traditional view that jury discussion of the case during the trial is improper arises from concerns that jurors will prematurely form judgments that will be difficult to dislodge later in the proceedings. <u>See</u> <u>Resko</u>, 3 F.3d at 689; <u>Winebrenner</u>, 147 F.2d at 328-29. The court in <u>Resko</u> cogently summarized these concerns in a criminal case:

> First, since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors, will be unfavorable to the defendant for this reason. Second, once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint.
>
> Third, the jury system is meant to involve decisionmaking as a collective, deliberative process and premature discussions among individual jurors may thwart that goal. Fourth, because the court provides the jury

-30-

with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the reasonable doubt standard. Fifth, if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence . . . and jurors form premature conclusions about the case, the burden of proof will have been, in effect, shifted from the government to the defendant, who has "the burden of changing by evidence the opinion thus formed." [Winebrenner, 147 F.2d] at 328.[30]

Finally, requiring the jury to refrain from prematurely discussing the case with fellow jurors in a criminal case helps protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt.

3 F.3d at 689-90 (citations omitted).

To be sure, not all of these reasons have force when the jurors are expressly told – as they are, for example, in Arizona – that they may discuss the evidence only in the presence of all jurors and that they must "reserve judgment about the outcome of the case until deliberations commence."  Ariz. R. Civ. P. 39(f). (Essentially, that is what the trial court told the jurors here.)

---

[30] In this case, for example, Jadlowe points out that the government introduced a number of audio recordings to prove his involvement in the drug conspiracy and that the jurors could have concluded early in the case, after discussion among themselves, that those tapes reflected his participation. Defense counsel, however, later sought to give those cryptic conversations a more benign interpretation by introducing other audio recordings indicating that Ferreira and Gonsalves were involved in various construction projects with the speaker believed to be Jadlowe and that furniture was being stored in the garage.

Yet, impressions formed about the evidence early on may nonetheless have a significant impact on the verdict, even if the jurors do not make their ultimate judgment until the end of the case. In our view, the traditional rationales remain persuasive.

Of course, not all premature jury discussion about a case will compromise a defendant's fair trial rights, particularly where the conversation does not reflect a point of view about the evidence or the outcome. See, e.g., United States v. Diaz, 597 F.3d 56, 63 (1st Cir. 2010) (noting that jurors apparently discussed only "a legal principle" and not "the merits of the case against the defendant"). Discussion such as that endorsed by the court in this case, however – about "interesting things witnesses say, significant pieces of evidence" – is inappropriate, even if the conversation was not what we ordinarily would consider premature "deliberations." Cf. State v. Washington, 438 A.2d 1144, 1148 (Conn. 1980) (noting that "[d]iscussion is an integral part of deliberations" and that, "[i]n a constitutional sense, the distinction between discussion and deliberation is more apparent than real"). Moreover, while jury discussion that does not involve expressions of ultimate opinions may be found harmless in retrospect, it is a different question whether district courts may give the jury permission at the outset of the trial to talk about the case before formal deliberations begin. We now hold expressly that they may not. We thus conclude that the court erred by giving

-32-

the jurors permission to discuss significant aspects of the case as the trial progressed.[31]

## B. Does the Error Require a New Trial?

### 1. Was the Instruction Structural Error?

Jadlowe argues that the court's instruction resulted in the denial of his due process rights and his right to a fair trial, and that it should be considered structural error requiring reversal without a showing of prejudice. See, e.g., United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (describing structural errors as "a very limited class of errors that affect the framework within which the trial proceeds" (citations omitted) (internal quotation marks omitted); Neder, 527 U.S. at 8. He further contends that, even if the error is not deemed structural, a new trial is necessary because the government is unable to prove the absence of prejudice from the instruction. See Neder, 527 U.S. at 7 (noting that most constitutional errors may be disregarded where they are "harmless 'beyond a reasonable doubt'" (quoting Chapman v. California, 386 U.S. 18, 24 (1967)); United States v. Carpenter, 403 F.3d 9, 11-12 (1st Cir. 2005).

The question in identifying structural error is whether the error affects the "'framework'" of the trial, "'rather than

---

[31] Although this case does not require us to impose an affirmative requirement that courts tell jurors not to discuss the case until deliberations formally begin, such an instruction is unquestionably the better practice.

simply . . . the trial process itself.'" Neder, 527 U.S. at 8
(quoting Arizona v. Fulminante, 499 U.S. 279, 310 (1991)).  In such
instances, "it is often 'difficul[t]' to 'asses[s] the effect of
the error,'"  Marcus, 130 S. Ct. at 2165 (quoting United States v.
Gonzalez-Lopez, 548 U.S. 140, 149 n.4 (2006)), because the nature
of a structural error is to "produce[] 'consequences that are
necessarily unquantifiable and indeterminate,'" Neder, 527 U.S. at
11 (quoting Sullivan v. Louisiana, 508 U.S. 275, 282 (1993)).  The
frequently cited examples of such errors include the complete
denial of counsel, a biased presiding judge, the denial of a public
trial, and a defective instruction on reasonable doubt.  Id. at 8;
see also, e.g., United States v. Curbelo, 343 F.3d 273, 281 (4th
Cir. 2003) (concluding that trial court's decision to proceed with
an eleven-person jury, over defendant's objection, was structural
error requiring reversal).

In the Supreme Court cases finding structural error, the
errors themselves effected a deprivation of rights, so that "[n]o
additional showing of prejudice is required to make the violation
'complete.'"  Gonzalez-Lopez, 548 U.S. at 146.  The Court explained
that characteristic of structural error in Gonzalez-Lopez, where it
contrasted denial of a criminal defendant's choice of counsel –
which it held to be structural error – with denial of the Sixth
Amendment right to effective representation of counsel – which
requires an additional showing of prejudice.  Id. at 147-48.

-34-

Deprivation of the right of choice is "'complete,'" the Court explained, "when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." Id. at 148. By contrast, violation of "the right to effective counsel" depends on the competence of "whatever lawyer is chosen or appointed." Id.

The type of error at issue here has "framework" implications. If the court's faulty instruction results in early discussion of the evidence or witnesses by the jurors, their later deliberations may be prejudiced in ways that would be difficult to identify or quantify. The jury's deliberative process – the collective, objective review of the evidence of record, evaluated as a whole, and guided by the court's closing instructions – may be compromised as a result of prematurely formed impressions. That potential harm is unlike the erroneous introduction of a piece of evidence or a flawed instruction that misstates or omits an element of the crime. Such errors are discrete trial events whose effect on the outcome of the trial may be evaluated in light of the properly admitted evidence or the instruction as a whole. By contrast, premature discussion raises the possibility that the jurors will view all of the evidence through a distorted lens, much like what occurs when the jury is improperly instructed on reasonable doubt. See Neder, 527 U.S. at 10-11 (noting that a flawed reasonable doubt instruction is "not subject to harmless-

error analysis because it 'vitiates <u>all</u> the jury's findings'" (quoting <u>Sullivan</u>, 508 U.S. at 281)).  Where the possibility exists that premature jury discussions shifted to the defendant "the burden of changing by evidence the opinion thus formed," <u>Winebrenner</u>, 147 F.2d at 328, the possibility exists that the trial was "an unreliable vehicle for determining guilt or innocence," <u>Neder</u>, 527 U.S. at 9.

Yet, the error here differs in a significant way from those the Supreme Court has labeled structural.  Although the instruction opens the door to discussion "taint[ing] the process by which guilt [is] determined," <u>Curbelo</u>, 343 F.3d at 285, the defendant will not necessarily be denied a fair trial as a result of the error.  Despite the instruction, juror discussion may not take place at all, and even if some preliminary conversation about the case occurs, it may be tangential to the jurors' determination of guilt or innocence.  Unlike the complete denial of counsel or a public trial, for example, the harm triggered by the flawed instruction does not occur – i.e., the constitutional violation is not "complete" – until prejudicial discussion occurs.  It is not necessarily the case, therefore, that "<u>all</u> or <u>almost all</u> such errors <u>always</u> 'affec[t] the framework within which the trial proceeds,' or 'necessarily render a criminal trial fundamentally unfair.'" <u>Marcus</u>, 130 S. Ct. at 2166 (quoting <u>Fulminante</u>, 499 U.S. at 310, and <u>Neder</u>, 527 U.S. at 9).

Jadlowe contends that the error must nonetheless be considered structural because a defendant would never be able to probe the jury's deliberations to prove prejudice. Inquiries into jury deliberations are, in fact, narrowly restricted by Federal Rule of Evidence 606(b), which bars juror testimony "as to any matter or statement occurring during the course of the jury's deliberations." The relevant inquiry, however, is not into the nature of the formal deliberations that occurred once the presentation of evidence concluded, but the nature of any juror discussion about the case prior to the formal deliberations. Probing such premature discussions is neither impermissible nor impossible. Indeed, courts routinely examine allegations of juror misconduct involving improper external influences and communications among jurors, and we see no relevant distinction between those contexts and this one. The threshold question would be whether any premature discussion took place. If so, was it among all jurors or just a few? Did discussion occur regularly through the proceedings, or only once – and at what point? What was the content of the discussion?

We thus conclude that Supreme Court precedent "insist[s] upon a showing of individual prejudice" when a court improperly instructs jurors in a criminal case that they may discuss the evidence before formal deliberations commence. Marcus, 130 S. Ct. at 2166. Indeed, although the practice remains rare, the

authorization of jury discussion in criminal cases by some courts and the Arizona Supreme Court Committee's recommendation that it be permitted in both civil and criminal trials reinforce our conclusion that the instruction here should not be classified as structural error requiring automatic reversal of the defendant's conviction. See supra nn. 25, 26 & related text; cf. Resko, 3 F.3d at 695 ("[W]e are unwilling to assume the existence of prejudice because we are far less certain that premature deliberations will lead to prejudice in every, or nearly every, instance."); United States v. Cruz, 156 F.3d 22, 28 (1st Cir. 1998) (upholding as adequate remedy the dismissal of three jurors who were heard discussing the case during a recess).

2. Prejudice

When a defendant properly preserves an objection to a trial error, the government bears the burden of proving that the error was harmless. United States v. Olano, 507 U.S. 725, 734 (1993); Curbelo, 343 F.3d at 278; United States v. Colón-Muñoz, 192 F.3d 210, 222 (1st Cir. 1999). For most constitutional errors, the government must show that the error was harmless beyond a reasonable doubt, Chapman, 386 U.S. at 24, and for most non-constitutional errors, the government must show that the error "did not have a 'substantial and injurious effect or influence in determining the jury's verdict,'" Curbelo, 343 F.3d at 278 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The choice

of standard need not detain us because, on this record, the outcome is the same under either one.

Neither the defendant nor the government asked the court to question the jurors about whether they had discussed any aspect of the case during the five days of trial, and no inquiry consequently was made into the content of any conversations they may have had. Such an inquiry could have revealed that the jurors discussed only tangential matters, allowing the government to easily satisfy its burden to show an absence of prejudice from the court's erroneous instruction. In some cases, such an inquiry could produce evidence that would advance the defendant's claim of prejudicial error. Given the potential significance of the jurors' actual response to an instruction allowing them to converse about the trial as it unfolds, both the prosecutor and defense counsel would be well advised to request a jury inquiry whenever a court gives an instruction like the one challenged in this case.

Here, the record is silent on whether the jurors engaged in premature discussions of the case and, hence, we must resolve the issue of prejudice by examining the information that _is_ available to us. Our starting point is the flawed instruction itself. The district court explicitly told the jurors, twice, "not to express an ultimate opinion about the outcome of the case," directing them to wait "until you begin deliberations and each have an opportunity to make your opinions known." Pursuant to well-

established precedent, "'we presume juries understand and follow the court's instructions.'" United States v. Gentles, 619 F.3d 75, 85 (1st Cir. 2010) (quoting United States v. Vázquez-Botet, 532 F.3d 37, 56 (1st Cir. 2008)). We thus presume that the jurors did not express opinions about Jadlowe's guilt or innocence.

The court, however, told the jurors they could discuss "idiosyncracies of the judge and the lawyers, interesting things witnesses say, significant pieces of evidence." Thus, in assessing the impact of the court's error, the question is whether we can say with assurance that, even if discussion of those matters occurred, the jury's deliberative process was not compromised. Our concern is whether the jurors were able to objectively evaluate the evidence as a whole when they engaged in formal deliberations, guided by the court's closing instructions. See Resko, 3 F.3d at 692 (focusing on the loss of "the jurors' impartiality" as the prejudice from an instruction allowing premature deliberations); Winebrenner, 147 F.2d at 327 ("Whether guilty or innocent, appellants were entitled under the Fifth and Sixth Amendments to the Constitution to a fair trial to an impartial jury."); id. at 330 (referring to the "right of the defendants to open minded deliberation") (Woodrough, J., dissenting).

We can easily discount the impact of any discussion about idiosyncrasies of the personnel. Such observations would have had little or no effect on the jurors' ability to dispassionately

consider the evidence against Jadlowe in its entirety.  We acknowledge, however, that the possible discussion of "significant pieces of evidence" or interesting testimony is more troubling. Such premature evidentiary deliberation could, in close cases, skew the final weighing of all the evidence.  This is not, however, a close case.  Video surveillance and audiotapes, bolstered by compelling circumstantial evidence, placed Jadlowe in the midst of a drug scheme that involved the temporary storage of ten kilograms of cocaine in his garage.  Despite flaws in the way certain evidence was presented, the record leaves no doubt about Jadlowe's complicity in the drug conspiracy.

Thus, even if we assume that some jurors talked too soon about the inculpatory tendency of certain evidence, the force of the government's case as a whole meant that any comments made during the course of the proceedings almost certainly had no influence on the jurors' ultimate evaluation of Jadlowe's guilt or innocence.  Inescapably, the possibility of taint to the jury process from conversations about particular evidence was diminished, if not entirely negated, by the overwhelming proof of guilt that confronted the jurors when they commenced formal deliberations.[32]  Because we are persuaded that the court's

---

[32] We emphasize that we consider the strength of the evidence in this context not to demonstrate that the evidence was sufficient to establish guilt beyond a reasonable doubt, but as part of our inquiry into whether premature discussion could have compromised the jury's deliberative process.  Harm to the deliberative process

erroneous instruction was harmless beyond a reasonable doubt, Jadlowe is not entitled to a new trial on the basis of that error.

**IV.**

Jadlowe asserts that the district court erred in admitting four types of evidence at trial: (1) a summary chart of wiretapped phone calls, (2) Agent Fallon's testimony identifying him on the surveillance video she recorded at 30 Arch Street on November 4, 2005, (3) Agent Simmons's testimony identifying Jadlowe's voice in wiretapped calls, and (4) transcripts of wiretapped conversations that identified Jadlowe as one of the speakers.

We review the district court's decisions to admit or exclude evidence for abuse of discretion. Diaz, 597 F.3d at 64.

**A. The Summary Chart**

Jadlowe argues that Government Exhibit 10, a six-column chart listing details for twenty-two of the intercepted phone calls, contained testimonial hearsay that should have been ruled inadmissible at trial. Specifically, he objects to the final column on the chart, which identifies the other phone number

---

could occur even in the face of powerful evidence of guilt. The jury process almost certainly would be tainted, for example, by an instruction allowing discussion of the ultimate issue of guilt before all of the evidence was presented, regardless of the strength of the government's case.

involved in each of the listed wiretapped conversations.[33]  Eleven of the twenty-two calls were made to or from a number associated with the 1022 phone seized from Jadlowe.  There is no dispute about the admissibility of the first five columns, which report, inter alia, the date and time of each call and which targeted phone number, Ferreira's or Gonzalves's, was involved.  That information also was listed on a computerized printout labeled as Exhibit 9, which Jadlowe concedes was properly admitted.

The information in Column 6 did not appear in written form on any other document admitted into evidence, and Jadlowe correctly points out that there is no evidence in the record about the creation of Column 6.  The government argues that Column 6 was admissible because the same information was contained in digital files that were part of Exhibit 8.  Exhibit 8 is a compact disk ("CD") that contains the oral recordings of the twenty-two phone calls listed on Exhibit 10; according to the government, the Column 6 information for each call is appended to its oral recording on the CD.  The testimony at trial indicated that the data on the CD was not accessible to the jurors, however, and the government at oral argument essentially confirmed that was so.[34]

---

[33] Column 6, labeled "Direction of Call/Phone No." also states whether the call was incoming or outgoing.

[34] In its brief, the government describes Exhibit 9 as "a computer-generated print-out of some of the embedded data from th[e] calls."  The record does not reveal whether the Column 6 information could have been retrieved in a similar format or how

Given the government's concession, we think there is force to the argument that Column 6 did not qualify as a summary of evidence already in the record. We nonetheless decline to probe other theories in support of its admission. Column 6 provided only one link between Jadlowe and the conspiracy by identifying the 1022 number as the other phone number in some of the intercepted calls. As we describe below in Section B, the audio and video surveillance produced much more direct evidence of Jadlowe's participation in the calls.[35] Hence, any error in allowing the list into evidence was harmless.

## B. The Remaining Evidentiary Issues

Jadlowe's three remaining contentions all concern the ways in which he was identified at trial as the individual who made the arrangements with Gonsalves and Ferreira for the cocaine delivery at 30 Arch Street. Agent Fallon identified him in the surveillance videotape shown at trial by comparing a photograph of him to the video image. Agent Simmons identified a voice on the tapes of the wiretapped phone calls as Jadlowe's, even though he

easy it would be to do so.

[35] Exhibit 10's relative unimportance to the case is reflected in a colloquy that took place at the close of evidence. When defense counsel renewed the objection to Exhibit 10, the district court commented that it did not view the document "as being a very critical piece of evidence linking anything to anything." The prosecutor agreed and stated that he would not object to its being redacted or excluded. The court said it would make a decision after reviewing Agent Fallon's testimony and, later that day, ruled the exhibit admissible without restriction.

had never spoken with Jadlowe in person; the transcripts of the wiretapped conversations given to the jury reflected Simmons's identification of Jadlowe as one of the speakers.

Jadlowe argues that the visual and voice identifications constituted improper lay opinion testimony because neither officer's identification was based on prior personal experience with Jadlowe and "[t]he jury was perfectly capable of drawing its own independent conclusion[s] based on the evidence presented." United States v. Garcia-Ortiz, 528 F.3d 74, 80 (1st Cir. 2008); see also Fed. R. Evid. 701 (allowing lay opinion testimony if, inter alia, it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue"). He asserts that the district court also abused its discretion in allowing the government to provide the jury with transcripts that presented as fact that he was the speaker.

We agree that the officers' identifications should not have been allowed as lay opinion testimony because neither Fallon nor Simmons was in a better position than the jurors to make the identity judgments. Indeed, Fallon testified that she made the identification by comparing his image on the screen with a driver's license photo that was in evidence. We are at a loss to understand the government's argument that Fallon was better situated than the jurors simply because she was watching the events as they were

occurring. At the time, she was looking at the same video image seen by the jurors at trial; the Registry of Motor Vehicle's photograph also was in evidence.[36] In addition, although the government is correct that "identification of a telephone caller may be [established] by circumstantial evidence," United States v. DiMuro, 540 F.2d 503, 514 (1st Cir. 1976) (quotation marks and citation omitted) (alteration in original), the circumstantial evidence on which Simmons relied to infer that Jadlowe was the speaker in the wiretapped conversations – the content of the calls and the physical surveillance reports – also was available to the jury.

Nonetheless, any error in allowing the officers' identifications or the related transcripts was unquestionably harmless. An abundance of circumstantial evidence pointed to Jadlowe as the individual whom Fallon saw clearing the garage at 30 Arch Street and whom Simmons heard in the phone conversations with Ferreira and Gonsalves.

In a phone conversation on October 8, for example, the caller whose voice Simmons identified as Jadlowe's reported to Gonsalves that he would be getting his hair braided and that he had been home all day on his birthday. Both items of information in

---

[36] Fallon also testified that her identification was aided by information from other officers on the scene confirming that Jadlowe was the person she was seeing on the video screen. That reliance on others further diminishes the foundation for her own identification.

-46-

the call were linked to Jadlowe. According to motor vehicle records, Jadlowe's birthday was the day before, October 7, and Simmons, who had seen Jadlowe multiple times before, testified that he saw Jadlowe with newly braided hair shortly after this conversation. In a call with Gonsalves on November 4, the speaker Simmons identified as Jadlowe was addressed as "Uncle Marc," and in another call the same day, just before 2 p.m., that speaker told Gonsalves that he was "[t]aking care of the garage" and that he was "[d]oin' it right now." According to Agent Fallon's testimony, it was at about that time that, with other officers' assistance, she identified Jadlowe as the individual she had seen moving items from the garage to the yard at 30 Arch Street.

Simmons's ability to identify Jadlowe in each instance in which Jadlowe was designated on the transcript as the speaker was supported by the agent's admissible testimony that he had listened to 25 to 50 calls involving the number associated with the phone seized from Jadlowe at 30 Arch Street on November 4, 2005, and that over time he was able to recognize the callers in those wiretapped conversations after "hearing the same voices every day." He testified that he had heard no one on that phone other than the speaker Gonsalves referred to as "Uncle Marc" in the November 4 call. Each of the calls attributed to Jadlowe was thus identified by Simmons as involving the same voice, including the other calls described above whose content was linked to Jadlowe.

Hence, even if it were improper for Simmons and Fallon to have offered their opinions that Jadlowe was the speaker in the wiretapped calls and the individual in the videotape, we are confident that any such error did not influence the verdict. This is equally true of the jury's exposure to the transcripts. Not only was there compelling circumstantial evidence that Jadlowe was properly identified as the speaker in the calls, but the district court also instructed the jurors at the time they received the transcripts that it was up to them "to make a determination as to whether the transcript is correct in its identification of Mr. Jadlowe as the speaker at the points at which he is so listed in the transcript." The court emphasized that "the transcript is only an aid," and that the jurors would "have to look to other evidence in the case to ensure yourself that that indeed is true." The court repeated that caution in its charge at the close of evidence, telling the jurors that if they "believe that the speaker has been wrongly identified, keep in mind that it is your understanding of the recording that matters."

On this record, there was no reversible error stemming from the challenged evidentiary rulings.

**V.**

Jadlowe has pressed serious concerns about the admission of evidence and the jury instructions, and on some of those issues we agree that the district court erred. On the record before us,

however, we cannot agree that those errors require a new trial.
The judgment of conviction is therefore affirmed.

So ordered.